In re Estate of Selma Wedelius, Formerly Insane, Now Deceased. Calumet National Bank, Administrator De Bonis Non of Said Estate, Appellee, v. South Chicago Savings Bank, Appellant.

Gen. No. 35,422.

Opinion filed April 5, 1932.

SCHNACKENBERG & HANSEN, for appellant; ELMER J. SCHNACKENBERG, of counsel.

HAIGHT, ADCOCK, BANNING & FATHCHILD, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

In January, 1931, the Calumet National Bank, as administrator *de bonis non* of the estate of Selma Wedelius, deceased, filed in the probate court of Cook county its verified petition to discover assets against the South Chicago Savings Bank, an Illinois banking corporation (hereinafter called the Savings Bank), to which petition the Savings Bank filed its verified answer. On April 24, 1931, after a hearing, the probate court entered an order dismissing the petition, from which order the Calumet Bank appealed to the circuit court where, during July, 1931, there was a trial *de novo,* resulting in the court entering an order or judgment on July 29, 1931, wherein the Savings Bank was directed "to transfer and deliver" to the Calumet Bank, as administrator, "a certain principal note in the amount of $10,000, signed by John Chimoures and wife, dated March 11, 1926, secured by a trust deed on

real estate in Cook county, Illinois, together with the trust deed, insurance policies, evidences of title and all other papers accompanying said note; also a principal note signed by Calumet National Bank, as trustee, in the amount of $4,000, dated May 9, 1930, and secured by trust deed on real estate in Cook county, together with the trust deed, insurance policies, evidences of title and all other papers accompanying said note (said last mentioned note being one heretofore substituted in place of a certain note made by Wellington B. Mitchell and wife, dated December 15, 1926, in the amount of $4,000).'' From this order or judgment the Savings Bank appealed.

There is no dispute as to the facts, which are in substance as follows:

For many years one Niel Lykke conducted a real estate and loan business in South Chicago, and for about 10 years he was in the habit of borrowing considerable sums of money from the Savings Bank on his individual notes, secured by collateral. The collateral usually consisted of notes, with interest coupons attached, executed by third persons and secured by trust deeds on real estate together with accompanying papers. If a loan was paid when due the collateral was surrendered to him; if a loan was renewed the collateral was retained; on occasions certain collateral was withdrawn and other collateral substituted therefor. The aggregate amounts of the loans made to him varied at different times from $3,000 to $45,000. He also maintained an individual deposit account with the bank. During his lifetime he acted as conservator in the probate court of the estate of Selma Wedelius, insane, and upon her death as administrator of her estate. He died on July 31, 1930. For about two years prior thereto he was one of the directors of the Savings Bank.

On April 7, 1930, Lykke borrowed from the Savings Bank the sum of $3,000, and gave to it his individual

note for said sum payable on demand to the order of the bank, and as security therefor deposited with the bank the promissory note of Wellington B. Mitchell and wife for $4,000, dated December 15, 1926, payable 5 years after date, and secured by a trust deed on certain real estate. Some time during May or June, 1930, Lykke substituted for the Mitchell note, etc., a note of the Calumet Bank, as trustee, for $4,000, dated May 9, 1930, payable to bearer on December 15, 1931, and likewise secured by a trust deed on certain real estate. On June 21, 1930, Lykke borrowed from the Savings Bank the further sum of $5,000, and gave to it his individual note for said sum, payable 90 days after said date to the order of the bank, and as security therefor deposited with the bank the promissory note of John Chimoures and wife, dated March 11, 1926, for $10,000, payable five years after date to the order of John Chimoures, and by him indorsed in blank, and secured by a trust deed on certain real estate. This was the first time that the Chimoures note had come into the possession of or to the notice of the Savings Bank. The Mitchell note, for which said substitution was made, had been in the bank's possession, on two prior occasions in 1927, as collateral security for other loans to Lykke. On all these transactions, wherein loans were made to him and collateral securities therefor deposited with the bank, said transactions were consummated on behalf of the bank solely through its president, Warren W. Smith. A vice president of the bank, Arthur H. Hansen, was a brother-in-law of Lykke, but Hansen did not act for the bank in any of said transactions with Lykke, and he (Hansen) never knew anything about the Mitchell, Calumet Bank or Chimoures notes until after Lykke's death.

When the Mitchell, Calumet Bank and Chimoures notes, and accompanying papers, were delivered to Smith (acting for the Savings Bank) as collateral security for the bank's loans to Lykke as aforesaid, all

three notes were complete and regular upon their face, and had not yet matured, and the Savings Bank had no actual notice or knowledge of any infirmity in them or of any defect in Lykke's title thereto, and took them in good faith and for value in the ordinary course of business. After Lykke had received the last loan of $5,000, on June 21, 1930, he owed the bank the total sum of $45,400.

About two months after Lykke's death, Smith, president of the Savings Bank, consulted attorney Alvin Hansen, of the law firm of Schnackenberg & Hansen, in regard to realizing on said securities. Hansen is the son of said Arthur H. Hansen. Upon examining the two notes (i. e., that of the Calumet Bank, as trustee, and the Chimoures note) and accompanying papers, Alvin Hansen recognized them as belonging to said Wedelius estate, of which Lykke had been acting as administrator, and Hansen as attorney for said administrator. Hansen knew that Lykke, during the lifetime of Selma Wedelius, had as conservator purchased the Mitchell and Chimoures notes for said estate, but he did not know, until after Lykke's death, that the notes had been pledged by Lykke with the Savings Bank as collateral *for his own individual indebtedness*. While neither said law firm nor Hansen was regularly employed by said bank as counsel, it or he occasionally did legal work for the bank, but neither the firm nor Hansen, prior to Lykke's death, represented the bank, or was consulted by it, as regards the Lykke loans or the collateral deposited as security therefor.

When Smith consulted Hansen at the time aforesaid the latter advised him of the facts, and this was the first time that either Smith, as president of the Savings Bank, or the bank had any notice that Lykke was not the real owner of said notes and securities, or that there was such a pending estate as the Wedelius estate. Thereupon Hansen notified the administrator of Lyk-

ke's estate of the facts. Subsequently, on October 24, 1930, the Savings Bank, after due notice, sold at a public sale said securities, and four other securities. The Savings Bank was the purchaser thereof at the sale. After applying the proceeds on Lykke's total indebtedness to the bank for borrowed money, there was still an unpaid balance due to the bank. The two notes, trust deeds and accompanying papers, mentioned in the order of the circuit court appealed from, are still in the possession of the Savings Bank and it claims to be the lawful owner of the same.

The theory of law upon which the circuit court acted in entering the order appealed from, as we understand it, was in substance that, as Lykke was a *director* of the Savings Bank at the times he borrowed from it said sums of money in April and June, 1930, and deposited with it said two negotiable notes, etc., as collateral security, and *knew* that he did not then have good title to said collateral, his knowledge must be imputed to the bank, whereby it cannot be considered to be a holder in due course of said notes, etc.

The main contention of counsel for the Savings Bank, relied upon for a reversal of the judgment, is that it is the law in Illinois in substance that, where a bank acquires negotiable instruments, complete and regular upon their face and payable to bearer, in good faith and for value, and without actual notice of any infirmity in the title of the transferor, knowledge of such infirmity will not be imputed to the bank merely because said transferor (who knew of such infirmity at the time of such transfer) was then a director of the bank; where it also appears that in the transactions by which the bank acquired the instruments it was represented by an officer who had no notice or knowledge of such infirmity, and the transferor in the transactions was acting only for himself and not in the interest of the bank. We are of the opinion that the contention

is a sound one, applicable to the undisputed facts of the present case. (See sections 52, 55 and 56, Illinois Neg. Inst. Law, Cahill's St. 1931, ch. 98, ¶¶ 72,75,76, p. 1954; *Higgins v. Lansingh,* 154 Ill. 301, 387–8; *Seaverns v. Presbyterian Hospital,* 173 Ill. 414, 421; *Home Savings & State Bank v. Peoria Agricultural & Trotting Society,* 206 Ill. 9, 13–14; *Allmon v. Salem Building & Loan Ass'n,* 275 Ill. 336, 344; *Metcalf v. Draper,* 98 Ill. App. 399, 405–6; *Mutual Investment Co. v. Wildman,* 182 Ill. App. 137, 144; *Sherman State Bank v. Smith,* 244 Ill. App. 171, 175–6.) In the present case Lykke, who was at the times of the transactions mentioned a director of the Savings Bank, did not act for the bank therein but in his own interest and adversely to the bank. And said transactions were conducted on behalf of the bank, by its president, Warren W. Smith, and he then had no notice or knowledge, nor did the bank, of the infirmity of Lykke's title to the negotiable instruments now in controversy.

Counsel for petitioner, in their printed brief here filed, admit that it *was* the law that "notice to an agent is not imputed to a corporation when the agent in the particular transaction in question is acting solely on his own behalf and, as it is sometimes stated, adversely to the corporation." But they state: "We submit, however, that such rule of law no longer obtains in the State of Illinois since the case of *Simmons v. Roseland Security Vault Co.,* 331 Ill. 563, was decided." And they particularly rely upon one sentence contained in the opinion in that case on page 574, viz.: "Notice to a director of a corporation is notice to the corporation." But after examining the facts of that case, as disclosed from the opinion, and considering the holdings and decision therein, we do not think that any radical departure from the prior Illinois decisions above mentioned was intended, or that there was such a departure. (See *Mayer v. Erhardt,* 88 Ill. 452, 457.)

Furthermore, in the opinion in the case of *Neagle v. McMullen,* 334 Ill. 163, 181 (decided since the *Simmons* case), a principle of law, enunciated in the above cited *Higgins* and *Seaverns* cases, applicable to the facts of the present case, is restated, viz.: ''Notice to an agent is not notice to the principal where the facts in the possession of the agent authorize the inference that he will *conceal* the information from his principal.'' Furthermore, in the still later case of *United States Cold Storage Co. v. Central Mfg. Dist. Bank,* 343 Ill. 503, our Supreme Court, quoting with approval from an opinion in a California case, says in part (p. 516): ''But charging a principal with knowledge merely because such knowledge is *possessed* by an agent and charging him with acts done by the agent *within the scope of his authority* are not the same thing, and it is only in the latter case that the principal may be bound by the uncommunicated information or intent of the agent when such information or intent is hostile to the principal.''

Counsel for petitioner further contend that the present case ''is not governed by the Negotiable Instruments Law, but depends upon the law relating to the assignability of mortgages,'' and that ''under such law, if the bank had sufficient knowledge to put it *on inquiry,* actual knowledge need not be shown.'' We cannot agree with the contentions. We think that the sections, above cited, of our Negotiable Instruments Law are here applicable. The notes involved are negotiable instruments. The mere fact that they were secured by trust deeds does not affect the right of the Savings Bank to be protected as an innocent purchaser of the notes, for value, and before maturity. (*Zollmann v. Jackson Trust & Savings Bank,* 238 Ill. 290, 294; *Humble v. Curtis,* 160 Ill. 193, 202; *Drouineau v. First Nat. Bank of Marion,* 244 Ill. App. 251, 255.)

And we do not think that, under the undisputed facts, there is any merit in petitioner's counsel's fur-

ther contention that the judgment of the circuit court should be sustained, because of "the well known equitable maxim that, where one of two innocent persons must suffer loss, the one who trusted the wrongdoer must bear the loss." This so-called maxim is referred to in 21 Corpus Juris, sec. 176, pp. 1170–72, in the article on "Estoppel." It is there said: "Wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it. Equity will not postpone the interest of one who has omitted no duty devolving on him to the interests of another whose *negligence* made it possible for the loss to occur." We fail to see the applicability of the maxim or principle of law to the present case, where no negligence whatever on the part of the bank, or its president, in accepting the collateral in question as security, was shown. In the case of *Toledo, W. & W. Ry. Co. v. Gilvin,* 81 Ill. 511, cited by petitioner's counsel in support of their contention, it is said (p. 517): "When one of two innocent persons must suffer by the knavery of a third, the party who trusted the knave must be the sufferer. It was gross negligence in the railway company to issue to Smith a bill of lading for grain without first having the possession and control of the grain. The loss sprang from this *negligence,* and not from any default of defendant."

For the reasons indicated the order or judgment of the circuit court of July 29, 1931, is reversed, because of error of law on the undisputed facts.

*Reversed.*

KERNER and SCANLAN, JJ., concur.