WILLIAM H. CHRISTINSON, Trustee, Plaintiff-Appellee, *v.* VENTURI CONSTRUCTION COMPANY *et al.*, Defendants-Appellants.

Fifth District  No. 81—581

Opinion filed August 23, 1982.

John J. Flood, of Musick & Mitchell, P. C., of Mt. Vernon, for appellants.

Alice M. Jordan, of Richard C. Cochran Law Office, of Fairfield, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

The defendants, Venturi Construction Company and Robert W. Venturi (hereinafter both defendants are referred to collectively as "Venturi"), appeal from a final judgment of the circuit court of Wayne County for $33,725.57 plus costs of suit, in favor of the plaintiff, William H. Christinson as trustee in bankruptcy *in re* Illinois Valley Acceptance Corporation (hereinafter referred to as "IVAC"). The plaintiff sued on two negotiable instruments which had been executed by Venturi. This appeal raises two issues. First, Venturi contends that the plaintiff is not a holder in due course because IVAC and the seller of the instruments in question, the Moody Manufacturing Company (hereinafter referred to as "Moody"), were so closely connected with one another that Moody's lack of good faith and its notice of Venturi's personal defenses should legally be imputed to the plaintiff. Second, Venturi asserts that the evidence at trial sufficiently established the defense of fraud in the factum under Section 3—305(2)(c) of the Uni-

form Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 3—305(2)(c)). For the reasons which follow, we affirm the judgment of the circuit court.

Venturi first purchased products from Moody in 1968. In May of that year, Venturi signed a trade acceptance for the first time, after being assured that the document was of no legal effect and would only be used to obtain financing for Moody. A Moody salesman provided Venturi with the names of two persons whom Venturi could contact to confirm the representations. Venturi did telephone these people and was assured that the statements were true. On this basis, Venturi signed the trade acceptance. About a year later, Venturi signed two more trade acceptances after the Moody salesman told him that the previous trade acceptance had been torn up. Venturi testified that he believed that he was not ordering goods, but rather was merely indicating his potential requirements for the coming year in order to facilitate bank loans for Moody and to insure better delivery of possible future orders to Venturi. Venturi testified on cross-examination that, although he had an opportunity to telephone his bank to determine the nature of the instrument which he was signing, he did not do so.

Robert W. Martin, Jr., testified for the plaintiff that he was an officer of IVAC and that he had received the two trade acceptances from Moody, paying for them by check. Martin further testified that each trade acceptance was acquired before its maturity date, that at the time of purchase he lacked notice of any defenses to the instruments, and that Venturi had not paid the trade acceptances. On cross-examination, Martin testified that Moody assigned all of its accounts receivable to IVAC pursuant to a written financing agreement and that some trade acceptances were accompanied by invoices and some were not.

The plaintiff brought suit on two instruments which were denominated as "trade acceptances."

> "A trade acceptance is a draft or bill of exchange drawn by a seller on the purchaser of goods sold, and accepted by the purchaser. Its purpose is to make the book account liquid and permit the seller to raise money on it before it is due under the terms of the sale. [Citations.] When properly drawn, it is negotiable paper and its use results in advantages to both the purchaser and the seller. Properly used, it represents current merchandise transactions only, and in this respect, it is different from an ordinary promissory note which may be given for a past due account, borrowed money or for any other consider-

ation. The principal function of a trade acceptance is to take the place of selling goods on an open account." (*Gilliland & Echols Farm Supply & Hatchery v. Credit Equipment Corp.* (1959), 269 Ala. 190, 192, 112 So. 2d 331, 332-33.) Venturi does not question the formal negotiability of the instant trade acceptances, nor plaintiff's status as a holder, and he has admitted his signature to both instruments. "When signatures [on commercial paper] are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense." (Ill. Rev. Stat. 1979, ch. 26, par. 3—307(2); *Leopold v. Halleck* (1982), 106 Ill. App. 3d 386, 389, 436 N.E.2d 29, 31.) Venturi seeks to raise several defenses. First, he contends that the plaintiff is not a holder in due course (see Ill. Rev. Stat. 1979, ch. 26, par. 3—302), which status would preclude Venturi from asserting most of his defenses (Ill. Rev. Stat. 1979, ch. 26, par. 3—305), because IVAC and Moody were so closely connected with one another, that Moody's lack of good faith and its knowledge of Venturi's personal defenses may legally be imputed to the plaintiff.

■ Under the close connection doctrine, a purchaser of negotiable paper cannot be a holder in due course if his relationship with the transferor of such paper is too intimate. (See *Unico v. Owen* (1967), 50 N.J. 101, 122-23, 232 A.2d 405, 417; J. White and R. Summers, Uniform Commercial Code sec. 14—8, at 479 (1972).) *Unico* treated a close connection between business entities as a separate bar to establishing holder in due course status, apparently distinct from the Uniform Commercial Code requirements of good faith (Ill. Rev. Stat. 1979, ch. 26, par. 3—302(b)), and lack of notice of claims or defenses (Ill. Rev. Stat. 1979, ch. 26, par. 3—302(c)). Although the doctrine has been discussed by the appellate court (*Schranz v. I. L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 520, 412 N.E.2d 1378; *Personal Finance Co. v. Meredith* (1976), 39 Ill. App. 3d 695, 700, 350 N.E.2d 781), *Meredith*, like *Unico*, arose from consumer financing transactions and was decided under section 17 of the Retail Installment Sales Act (Ill. Rev. Stat. 1975, ch. 121½, par. 517) and *Schranz*, in language which we find significant, discussed closely connected entities in terms of a "more stringent *analysis of the good faith element* conducted by courts when examining consumer financing transactions." (Emphasis added.) (*Schranz v. I. L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 520.) "A consumer who executes a note often has no way of investigating the honesty of the person with whom he deals and his only realistic remedy in the event of breach is to withhold payment." (*Bowling Green, Inc. v. State Street Bank & Trust Co.* (1st

Cir. 1970), 425 F.2d 81, 85.) The close connection doctrine was apparently fashioned to preserve this remedy for the consumer: where two entities are interrelated, and one of the entities breaches an executory contract with a consumer, allowing the consumer to raise the seller's default as a defense against the financing entity provides realistic protection for the consumer. However, a commercial obligor typically does not share the defenselessness which characterizes the consumer debtor. Therefore, where a transaction does not involve a consumer as a party, this need for protection is absent, and in such a case, the bald conclusion that two entities are closely connected, without more, provides no reason for denying the holder of an instrument the favored status of the holder in due course.

The statutory concepts of good faith and notice, however, provide an adequate analytical framework for judicial scrutiny of the facts underlying the alleged close connection. Therefore, we, like the court in *Schranz*, will not analyze the evidence of the Moody-IVAC interrelationship under the rubric of "close connection," but rather will consider such evidence as a factor in determining the existence of good faith and the absence of notice.

■ Section 1—201(19) defines good faith subjectively as "honesty in fact in the conduct or transaction concerned." (Ill. Rev. Stat. 1979, ch. 26, par. 1—201(19).) The issue of good faith "is a question of fact to be left to the trier of fact." (*Schranz v. I. L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 520.) Although Venturi argues that many facts point to IVAC's lack of good faith, most of these facts evidence only that IVAC provided all, or nearly all, of Moody's financing and was therefore accorded certain collateral powers to protect its investment. These powers were granted by the financing agreement and included the power to open mail and to endorse Moody's signature to invoices and drafts against debtors, and the right to inspect Moody's books and records for the purpose of monitoring Moody's financial condition. None of these powers indicates that IVAC was less than "honest in fact" with regard to the two transactions in question. Considering all of these facts as a whole, as Venturi urges us to do, we cannot conclude that IVAC's purchase of the instant trade acceptances was necessarily fraught with bad faith by the existence of the IVAC-Moody interrelationship. Consequently, the trial court's decision was not against the manifest weight of the evidence. See *Dutton v. Roo-Mac, Inc.* (1981), 100 Ill. App. 3d 116, 122, 426 N.E.2d 604.

■ Section 1—201(25)(c) provides that a person has notice of a fact when "from all the facts and circumstances known to him at the time in question he has reason to know it exists." (Ill. Rev. Stat.

1979, ch. 26, par. 1—201(25)(c).) The first issue concerning notice is whether the relationship between IVAC and Moody constituted reason for IVAC to know that Moody was breaching the contracts underlying the negotiable instruments which IVAC was purchasing. Under this test, Venturi had to show that IVAC should have known, from all the facts and circumstances, that the trade acceptances in question had not generated corresponding shipments of merchandise. IVAC's powers under the financing agreement pertained to keeping itself informed of Moody's financial condition by enabling it to verify Moody's accounts receivable. IVAC's power to open mail and sign drafts was apparently designed to protect IVAC in the event of Moody's insolvency. Because these facts do not involve Moody's shipping procedures, we cannot conclude that IVAC should have been aware of Moody's breach of the underlying contracts.

■ Venturi contends, however, that because no invoices were attached to the trade acceptances, even though other trade acceptances had invoices attached, and because the due date of each instrument was nearly a year after the date the documents were executed, IVAC was put on notice that Venturi had not received any merchandise from Moody. On cross-examination Martin testified that some documents purchased from Moody were accompanied by invoices describing what was being purchased from Moody and that other documents had no such invoices. Apparently the trade acceptances in question were not the only instruments purchased without accompanying invoices. There was no evidence showing that, at the time of purchase, the absence of invoices was unusual. Under the circumstances, we cannot say that these facts constituted notice to IVAC. We note too that this argument has overtones as to the negotiability of trade acceptances. The purchaser of a purportedly negotiable instrument need only look to the instrument itself to determine its negotiability. (Ill. Ann. Stat., ch. 26, par. 3—105, Official Comment 8, at 11 (Smith-Hurd 1981 Supp.); *Equitable Trust Co. v. Harger* (1913), 258 Ill. 615, 617, 102 N.E.209.) Therefore, an argument which would require the purchaser of otherwise negotiable paper to look to a separate instrument in order to determine the negotiability of the purchased paper must be rejected.

■ The second part of Venturi's argument is that because the due date was nearly a year after the documents' date of execution, IVAC had notice of the irregularity of the underlying transaction. The Alabama Supreme Court in *Gilliland* indicated that the purpose of a trade acceptance "is to make the book account liquid and permit the seller to raise money on it *before it is due* under the terms of the

sale." (Emphasis added.) (269 Ala. 190, 192, 112 So. 2d 331, 333.) In view of this purpose, the fact that an instrument is payable at a future time cannot be considered a circumstance under section 1—201(25)(c) from which the purchaser would have reason to know that the underlying transaction was of an irregular nature. We conclude that IVAC had no notice of any fact which would preclude the status of a holder in due course.

Venturi's final contention is that IVAC may not recover on the instruments because the evidence at trial established that Venturi's signature was procured by representations amounting to fraud in the factum. Under section 3—305 of the Uniform Commercial Code, a holder in due course takes a negotiable instrument subject only to certain defenses, including "such misrepresentation as has induced the party to sign the instrument with neither knowledge nor *reasonable opportunity to obtain knowledge* of its character or its essential terms." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 26, par. 3—305(2)(c).) As Uniform Commercial Code Comment 7 to section 3—305 indicates:

> "The test of the defense here stated is that of excusable ignorance of the contents of the writing signed. The party must *** also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the age and sex of the party, his intelligence, education and business experience; his ability to read or understand English, the representations made to him and his reason to rely on them or to have confidence in the person making them; the presence or absence of any third person who might read or explain the instrument to him, or any other possibility of obtaining independent information; and the apparent necessity, or lack of it, for acting without delay.
>
> Unless the misrepresentation meets this test, the defense is cut off by a holder in due course." (Ill. Ann. Stat., ch. 26, par. 3—305, Uniform Commercial Code Comment 7, at 184-85 (Smith-Hurd 1963).)

Although Venturi established that he signed the trade acceptances without actual knowledge of their nature, he also testified that he called two people to confirm the salesman's representations and that he had the opportunity to call his bank to determine the nature of the instrument which he was signing. Under these circumstances we cannot say that Venturi had no reasonable opportunity to obtain knowledge of the instruments' character and essential terms. The trial

court's judgment against Venturi is therefore not against the manifest weight of the evidence. *Dutton v. Roo-Mac, Inc.* (1981), 100 Ill. App. 3d 116, 122.

We therefore affirm the judgment of the circuit court of Wayne County.

Affirmed.

JONES and KASSERMAN, JJ., concur.