FIRST NATIONAL BANK OF
CICERO, Plaintiff,

v.

UNITED STATES of America, United States Department of Justice, Federal Bureau of Investigation, Edward D. Hegarty, in his capacity as Special Agent in charge of the Federal Bureau of Investigation, Lewco Securities Corporation, Thompson McKinnon Securities Incorporated, Sandrisser & Company, Edith E. Graham, Standish Bradford, Jr., and Miranda T. Winthrop, Administrators of the Estate of Adam Winthrop, Deceased, Donaldson, Lufkin & Jenrette Securities Corporation, American Telephone and Telegraph Company, the Coca-Cola Company, Gelco Corporation, Pacific Gas and Electric Company Ual, Incorporated, Xerox Corporation, and Unknown Claimants, Defendants.

No. 83 C 2459.

United States District Court,
N.D. Illinois, E.D.

Jan. 13, 1986.

Michael P. Mullen, Burke, Griffin, Chomicz & Wienke, Chicago, Ill., for plaintiff.

John W. Dondanville, Baker & McKenzie, Chicago, Ill., for Donaldson, Lufkin & Jen-

rette Securities Corp. and Thompson McKinnon Securities.

David L. Carden, Coffield Ungaretti Harris & Slavin, Chicago, Ill., for Lewco Securities.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff First National Bank of Cicero ("Bank") has brought this action to recover certain bond and stock certificates (collectively, "securities") that it accepted as collateral for over $2,000,000 in loans and which were stolen from the various defendants in this suit. The United States is currently in possession of these securities pursuant to an FBI investigation and grand jury indictment of those involved in the stealing and transporting of the securities. The plaintiff seeks recovery and a judgment declaring the rights of all parties in the securities and awarding damages.

Defendants Thompson McKinnon Securities, Inc. ("McKinnon"), Donaldson, Lufkin & Jenrette Securities Corporation ("Donaldson"), and Lewco Securities ("Lewco"), from whom some of the securities involved in this case were stolen, have moved for summary judgment. The primary issue of law in the case is whether the Bank qualifies as a bona fide purchaser of the securities under the Illinois Commercial Code ("Code"), Ill.Ann.Stat. ch. 26, § 8–302 (1974), because, if it does, it acquired the security free of any adverse claim. Ill. Ann.Stat. ch. 26, § 8–301(2) (1974). Because of the importance and disputed nature of facts central to determining bona fide purchaser status, the court denies defendants' motion.

## I. FACTS

Certain facts in this case are not disputed. First, it is undisputed that between February 25, 1982 and June 8, 1982 the Bank made a series of loans to David Bruun, and to M & P Cartage and its principals, Edward and Edele Bontkowski, in exchange for certain securities as collateral.

Between March 11, 1982 and June 8, 1982, the Bank made a series of loans in the name of David E. Bruun totalling $1,368,000, secured by $495,000 in Intermountain Power Agency Power Supply revenue bonds, 1981 Series D, due 2018; $250,000 in Intermountain Power Agency Power Supply revenue bonds, 1981 Series D, due 2021; $1,000,000 in New Jersey Health Care Facilities Financing Authority revenue bonds, Series A, due 2010; and certain listed stock. Each of the bonds pledged as collateral was in bearer form, making it freely negotiable. Defendant Lewco claims an interest in the New Jersey Health Care Facilities Financing Authority revenue bonds; defendant McKinnon claims an interest in the other bonds involved in the Bruun loans; and defendant Donaldson claims an interest in both sets of bonds and in the stocks.

On February 25, 1982, the Bank received $480,000 Industrial Development Corp. of Port of Corpus Christi Series 1981–A bonds from M & P Cartage. On the basis of this collateral the Bank issued a series of loans to M & P Cartage and its principals totalling $569,000. Defendant Donaldson claims an interest in these bonds.

Also undisputed is the fact that on June 10, 1982, the Bank's president and chairman of the board, Joseph J. Schuessler, learned for the first time that some of the Bruun loan bonds were stolen and immediately reported this fact to the FBI, the Office of Comptroller of the Currency, the Federal Reserve Board and the Federal Deposit Insurance Corporation. Scheussler learned later that day that all the bonds and stock securities used to collateralize the Bruun and Cartage/Bontkowski loans were stolen.

William Giova was involved as senior vice-president and senior loan officer in all the loans at issue in this case. Giova was later indicted by a federal grand jury and pled guilty to receiving kickbacks from the loans. It is beyond dispute that Giova knew that the loans were fraudulently acquired, that their proceeds would be to a considerable extent diverted from their rep-

resented purposes, and that he would benefit personally from some of the diversion. However, whether Giova knew that the collateral had been stolen remains unresolved. Both parties agree that Giova never inquired into the validity of the collateral. However, the manner in which the parties argue this motion suggests that there is little if any evidence that he was personally aware that the securities were obtained by theft. The factual inquiry into what Giova knew or did not know goes to the issue of whether he had actual notice of the adverse claims to the securities. This notice in turn goes to whether the Bank can claim bona fide purchaser status.

Beyond the problem of identifying what Giova knew or didn't know is the legal question of whether his actual (or constructive) knowledge can be imputed to the Bank. This legal question is governed by agency doctrine that rests on several factual issues that have yet to be developed. One is the extent of Giova's authority. Defendants claim that Giova was acting without meaningful supervision when he made the loans and took possession of the securities. As a "sole actor" Giova's acts must, defendants argue, become the Bank's acts. The Bank vigorously contests the way defendants characterize Giova's authority. It claims Giova was under supervision for each loan made and never had authority to approve the loans. While this dispute alone argues against summary judgment, it leaves undeveloped certain key facts. As indicated above, Giova's stance vis-a-vis the loans—his knowledge of their fraudulent nature and his own interest in the money—can be separated from his stance vis-a-vis the collateral. If seen as separate transactions, a factual question arises regarding the extent of Giova's authority to accept collateral for the Bank. Neither side has addressed this issue.

The second set of factual issues go to Giova's motive for accepting the stolen collateral. The Bank argues as a matter of agency law that, because Giova was acting adversely to its interests by participating in the loan frauds, his knowledge cannot be imputed on it. However, if we separate Giova's relationship to the loans (specifically their proceeds) from his relationship to the collateral the issue of adversity is far from clear. First, as stated above, it is unclear whether Giova knew the collateral was stolen. Second, if he did not, it is unclear why he never made any attempt to validate the collateral. Again, these are factual issues that neither side has addressed, and which preclude summary judgment at this point.

## II. ISSUES OF LAW

The Bank claims to be the bona fide purchaser of the stolen securities used as collateral for the subject loans. In order for the Bank to have bona fide purchaser status it must prove it was a "purchaser for value in good faith and without notice of any adverse claim." Ill.Ann.Stat. ch. 26, § 8–302 (1974); *see Oscar Gruss & Son v. First State Bank of Eldorado,* 582 F.2d 424, 433 (7th Cir.1978). A person gives "value" for rights if he acquires them in return for a binding commitment to extend credit, Ill.Ann.Stat. ch. 26, § 1–201(44)(a) (1974), and defendants do not dispute that value was given. The Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." Ill.Ann.Stat. ch. 26, § 1–201(19) (1974). The test of good faith focuses only on "the subjective intent with which the purchaser acted." *Gruss,* 582 F.2d at 432. A person has "notice" of a fact under the Code when

> (a) he has actual knowledge of it; or
>
> (b) he has received a notice or notification of it; or
>
> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge," of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know....

Ill.Ann.Stat. ch. 26, § 1–201(25) (Supp. 1985).

In *Gruss,* the Seventh Circuit rejected the argument that the "test of notice is

essentially one of good faith or honesty in fact," stating rather that the concepts of notice and good faith are separate under the Code and that "either *actual or constructive* notice will prevent one from obtaining the favored status of bona fide purchaser." *Id.* at 431 (emphasis added); *see also Miriani v. Rodman and Renshaw, Inc.,* 358 F.Supp. 1011, 1013 (N.D.Ill. 1973); *Erlich v. Nyberg,* 78 Ill.App.3d 500, 33 Ill.Dec. 549, 396 N.E.2d 1273 (1st Dist. 1979); *cf. Hatton v. Money Lenders & Associates, Ltd.,* 127 Ill.App.3d 577, 82 Ill. Dec. 826, 469 N.E.2d 360 (1st Dist.1984) (holders in due course); *Christinson v. Venturi Construction Co.,* 109 Ill.App.3d 34, 64 Ill.Dec. 674, 440 N.E.2d 226 (5th Dist.1982) (holder in due course). Thus, good faith under the Code is based on a subjective view of the facts, whereas notice is based on an objective view. *See* Aronstein, *Investment Securities,* 39 The Business Lawyer 1375, 1376 (1984). Actual or constructive knowledge and good faith are both standards determined by the facts of each case. *Schranz v. I.L. Grossman, Inc.,* 90 Ill.App.3d 507, 517, 45 Ill.Dec. 654, 663, 412 N.E.2d 1378, 1387 (1st Dist.1980); *Walter E. Heller & Co. v. Convalescent Home of the First Church of Deliverance,* 49 Ill.App.3d 213, 221–222, 8 Ill.Dec. 823, 829, 365 N.E.2d 1285, 1291 (1st Dist.1977) (good faith is to be determined by the facts of each case.)

Defendants do not argue that, subjectively, the Bank (meaning those other than Giova) took the securities other than in good faith.[1] However, they make several arguments regarding notice that must be addressed.

## A. Constructive Notice and Bona Fide Purchaser Status

Defendants never once argue that Giova had actual notice that the collateral was stolen, and this remains, as we noted earlier in the opinion, a disputed issue of fact. However, defendants deal extensively with the legal issue of whether the Bank through Giova had constructive notice of the thefts. They begin their argument with the proposition that the notice requirement for bona fide purchaser status incorporates a duty to inquire into the status of securities before they are received or taken into possession as collateral. Defendants claim that this duty to inquire is defined by Rule 17f–1 of the SEC Lost and Stolen Securities Program. 15 U.S.C. § 78q(f)(1)–(5), amended by Pub.L. No. 94–29 (June 4, 1975). Congress established this program to address the problems created by missing, lost, counterfeit or stolen securities. SEC Release No. 34–15015, 43 Fed.Reg. 34790 (1978).[2] The rule requires that:

> Every reporting institution [which the Bank undisputedly is] except a registered transfer agent shall inquire of the Commission or its designee with respect to every security which comes into possession or keeping, whether by pledge, transfer, or otherwise, to ascertain whether such security has been reported as missing, lost, counterfeit or stolen....

17 C.F.R. § 240.17f–1(d)(1) (1984). The Commission's designee is the Securities Information Center (SIC), a computer-based

---

**1.** Using the same line of agency doctrine that defendants use to trace notice from Giova to the Bank, *see infra* pp. 13–17, defendants could have an argument that the Bank acted in bad faith because Giova had reason to suspect the validity of the collateral and did not check to make sure the collateral was valid.

**2.** See SEC letter to Mr. Perlson, vice-president and trust counsel, M & I Marshall and Ilsley Bank, Sept. 5, 1979:
 ... the purpose of Section 17(f)(1) of the Act, Rule 17f–1 and the Lost and Stolen Securities Program (the "program") thereunder is to reduce trafficking in missing, lost, counterfeit or stolen securities ... by making available to

reporting institutions, including banks whose deposits are insured by the Federal Deposit Insurance Corporation and banks that are members of the Federal Reserve System ... information that promptly identifies those securities prior to their further negotiation. Stated affirmatively, inquiry, as envisioned by the Act, assures inquiring institutions that securities in their possession have not been reported as missing, lost, counterfeit or stolen. That assurance, in turn, facilitates negotiation of securities. Without inquiry, this assurance does not exist, and lost and stolen securities remain in the stream of commerce.

information service which maintains a current list of reported lost or stolen securities and which any reporting institution can access by phone.

The rule leaves up to the reporting institution whom in its hierarchy will be responsible for inquiry. The rule also does not specify the time at which such inquiries must be made. The Commission did comment, however, that "[i]t is expected ... that a reporting institution will make inquiry prior to giving value, particularly if the securities or circumstances appear to be suspicious, in order to verify that the securities have not been reported as missing, lost, counterfeit or stolen." SEC Release No. 34–15015, 43 Fed.Reg. 34792 (1978); *see also* SEC letter to J.P. Harris, Jr., Pres., Union National Bank, Sept. 25, 1979 ("A registrant, therefore, is left to the sound exercise of business judgment in its determination of when inquiry should be made.")

This court has not found a single case interpreting the language of SEC Rule 17f–1, let alone addressing the issue of how the rule fits in with the bona fide purchaser scheme under each state's uniform commercial code. Defendants argue that Congress meant to somehow preempt state codes by making the duty to inquire under Rule 17f–1 a matter of federal law. This would in turn make the notice requirement for bona fide purchaser status a federal matter, at least in part.

This court must find the Illinois Commercial Code preempted by Rule 17f–1 and its authorizing legislation under one of three circumstances:

First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. Second, even in the absence of express preemptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

(Citations omitted.) *Michigan Canners & Freezers Assoc. v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). No indication of Congressional intent to determine or regulate bona fide purchaser status can be found in the congressional record.[3] Caution in finding preemption is further counseled by the "assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981).

■ Fortunately, the court here does not have to rule on the preemption issue because the state and federal law are not in conflict. *California v. Zook*, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1949). Because the notice concept is objectively defined under the Illinois Code and its case law, the concept by implication incorporates general commercial practices regarding inquiry and other protective measures operative for dealing with investment securities. *See* UCC § 8–304, Comment 1, incorporated in the Illinois Code at Ill.Ann.Stat. ch. 26, § 8–304 (1974). The court in *Morgan Guaranty Trust Co. of New York v. Third*

---

**3.** That Congress knew the Inquiry Program would have some effect on bona fide purchaser status is revealed in the House Conference Report, which states:

The Commission should carefully weigh the benefits of mandating inquiry in any specific situation against the costs and effects on efficient business practices and take into consideration the need to avoid requirements which

may affect the legal status of a bona fide purchaser in a manner which would unjustifiably disrupt the course of normal business transactions.

H.R.Rep. No. 94–229, 94th Cong., 1st Sess. 104, *reprinted in* 1975 U.S.Code Cong. & Ad.News 179, 335. However, the extent to which Congress wanted to reach in and rework the law on bona fide purchaser status is far from clear.

*National Bank of Hampden Co.,* 400 F.Supp. 383, 390 (D.Mass.1975), indicated as much when it held that due diligence in investigating the validity of securities was required for bona fide purchaser status under Massachusett's equivalent of Illinois Code is § 8–302.[4] *See also Insurance Co. of North America v. United States,* 561 F.Supp. 106, 116 (E.D.Pa.1983) (notice requirement for bona fide purchaser status depends on acting in accord with the "standards of a commercially sophisticated purchaser.") Reasonable commercial practice regarding inquiry should include the inquiry requirement of Rule 17f–1.

■ Holding that the Bank had a duty under the Illinois Code as interpreted by case law to validate the collateral by contacting the SIC does not, however, close this case. Rather, there still exists the factual issue of whether the Bank satisfied its duty to inquire under the rule. The Bank has the opportunity to show what are acceptable commercial practices regarding inquiry. The Bank has acknowledged that inquiry to the SIC was part of its routine practice. However, it may not have been unreasonable to give the responsibility for such inquiry to a senior loan officer like Giova. If this is the case, Schuessler's subsequent reliance on Giova's statements that he had verified the authenticity of the securities would not have been unreasonable. To the contrary, it might be unreasonable or an unacceptable commercial practice to require the president or chairman of the board to inquire into the validity of each security received by a bank as collateral. The Bank can also show that verbal verification is standard practice, so that it was not unreasonable for Schuessler *not* to require Giova to give him written verification. If the Bank was following generally accepted commercial practices

then it did not have constructive notice of the stolen collateral independent of Giova and his knowledge or constructive notice. If this is the case, all the issues of agency which have lurked in the background come to the forefront.

## B. Imputed Knowledge as a Matter of Agency Law

Defendants contend that Giova's knowledge or constructive notice that the securities were stolen must be imputed to his principal, the Bank, vitiating the Bank's claim that it had no notice of defendants' adverse claims to the securities. Before addressing defendants' arguments specifically, it is important to understand the general framework of agency doctrine.

The general agency rule is that "a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business." *Curtis v. United States,* 262 U.S. 215, 222, 43 S.Ct. 570, 572, 67 L.Ed. 956 (1923); *In Re Matter of Pubs, Inc. of Champaign v. Bank of Illinois in Champaign,* 618 F.2d 432 (7th Cir.1980); *United States v. Fox Lake State Bank,* 240 F.Supp. 720 (N.D.Ill.1965), *affirmed in part, reversed in part,* 366 F.2d 962 (7th Cir.1966). The rule is based on the presumptions that (1) the agent has a duty to impart his knowledge to his principal, and (2) the agent has performed that duty. *Metropolitan Sanitary District of Greater Chicago v. Pontarelli & Sons, Inc.,* 7 Ill.App.3d 829, 840, 288 N.E.2d 905, 912 (1st Dist.1972); *see also* 3 W. Fletcher, *Corporations,* § 790 at 12 (1975).

■ From this fairly straightforward beginning the rule takes two turns that make it difficult to apply in this case. First, an exception to the rule applies when the agent acts adversely to his principal, based on the theory that the agent cannot be

---

**4.** The court based its holding on Mass.G.Law ch. 106, § 1–201(27), which is virtually identical to Ill.Rev.Stat. ch. 26, § 1–201(27), and states:

  Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in

any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine.

presumed to communicate his knowledge to the principal in this case. 3 W. Fletcher, *Corporations,* § 819 at 90–91 (1975); Restatement of Agency 2d, § 282 at 611 (1958); 19 Am.Jur.2d, § 1266 at 672 (1965); *Maryland Casualty Co. of Baltimore v. Queenan,* 89 F.2d 155, 157 (10th Cir.1937); *Monroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936); *Thomson-Houston Electric Co. v. Capitol Electric Co.,* 65 F. 341, 343 (6th Cir.1894); *Slade v. Shearson Hammill & Co., Inc.,* 79 F.R.D. 309, 313 (S.D.N.Y. 1978); *Metropolitan Sanitary District of Greater Chicago v. Pontarelli & Sons, Inc., supra,* 288 N.E.2d at 912; *Neagle v. McMullen,* 334 Ill. 168, 181, 165 N.E. 605 (1929); *In Re Estate of Wedelius,* 266 Ill. App. 69 (1st Dist.1932). The cases seem to use a subjective standard to find adversity, *i.e.,* they look at the agent's motive to determine whether he was acting in his own interests and against the interests of his principal. *McKey & Poague, Inc. v. Stackler,* 63 Ill.App.3d 142, 20 Ill.Dec. 130, 379 N.E.2d 1199 (1st Dist.1978). If Giova fits this exception, then the Bank took without notice and is a bona fide purchaser.

█ The second twist to the general rule is an exception to the exception. If the adverse agent is also the sole representative of the principal in the transaction in question, the principal will be charged with the agent's knowledge if the principal seeks to retain the benefit of the transaction. 3 W. Fletcher, *Corporations,* § 827 at 122–123 (1975); 19 Am.Jur.2d, § 1267 at 673 (1965).

> In such a case the principal is impaled on the horns of a dilemma. If he disclaims the agent's act as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's act, after knowledge of the facts, he must in fairness be charged with the agent's knowledge.... ... The real ground upon which the situation rests is ... the corporation cannot claim anything except through [the agent] and therefore if it claims through him, after notice of the facts, it must

accept his agency with its attendant notice.

*Maryland Casualty Co. v. Queenan,* 89 F.2d 155, 157 (10th Cir.1937); *O'Connor v. Central National Bank & Trust Co. of Peoria,* 306 Ill.App. 414, 28 N.E.2d 755 (2d Dist.1940). In other words, when the principal has no avenue through which to claim ownership of the disputed property except through its agent, it will be charged with its agent's knowledge. *Connecticut Fire Ins. Co. v. Commercial National Bank,* 87 F.2d 968, 969–70 (5th Cir.1937); *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936); *Bosworth v. Maryland Casualty,* 74 F.2d 519, 521 (7th Cir.1935). Courts have found an agent to be the "sole actor" for his principal when "the whole procedure ... was entrusted by [the principal] to the initiation and execution of [the agent]...." *Curtis Co. v. United States,* 262 U.S. 215, 222, 43 S.Ct. 570, 572, 67 L.Ed. 956 (1923); when the agent was "in complete control of [the principal's] affairs," *Matanuska Valley Bank v. Arnold,* 223 F.2d 778, 781 (9th Cir.1955); or when "there is not the slightest indication that any officer or employee of the bank except [the agent] exercised any independent choice or judgment." *Bosworth v. Maryland Casualty, supra,* at 521. If Giova fits this further exception, then his knowledge imputes to the Bank for purposes of any claim to the securities.

Defendants charge that Giova's knowledge of the fraudulent nature of the loans must be imputed to the Bank because he was the sole actor for the Bank and the imputation of that knowledge destroys the Bank's protected status even in the absence of Giova's actual knowledge of the theft of the collateral. While the court may ultimately reach this conclusion there are at present too many unresolved issues of fact to rule on this point. First, the scope of Giova's authority is hotly contested. Defendants claim that "Giova was admittedly the *sole* actor for the Bank in the transactions involving the stolen securities" (memorandum in support of defendants' motion for summary judgment, p. 24) and that none of the loans were approved by anyone other than Giova. *Id.* at 2.

Plaintiff denies these statements and has submitted a lengthy deposition of then-Bank Chairman Schuessler detailing the supervisory procedures the Bank used to approve Giova's loans. However, plaintiff's description of the procedures does not clearly delineate Giova's authority vis-a-vis the collateral. It is possible that even though the Bank's officials approved Giova's total loan package he had complete control over accepting and verifying the collateral. In that case a trier of fact could conclude that Giova acted as a "sole actor" vis-a-vis the collateral.

Such a finding would not, however, end the discussion. It is still necessary to make findings of fact regarding Giova's state of mind, *i.e.*, whether he was acting adversely to the Bank in accepting stolen collateral. It is obvious that a transaction involving stolen securities as collateral is against the interest of the Bank. *See Montgomery v. Commercial Trust & Savings Bank*, 286 Ill.App. 241, 245, 3 N.E.2d 139 (1st Dist.1936). However, if adversity is determined using a subjective standard, then whether or not Giova knew the collateral was stolen is a key factual issue. Further, if he did not know because he failed to check with the SIC, another factual issue arises. Why did Giova fail to check? Was it mere negligence or a sense that given the shady nature of the deals ignorance was bliss? A trier of fact could find Giova was acting adversely either because he knew the securities were stolen or because he intentionally failed to check on the suspicion that something was wrong. But if Giova did not know because of an innocent oversight on his part, he cannot be held to be acting adversely. Note that, if this is the case, the Bank may still be held as having constructive notice through Giova under the theory that the principal will be charged with knowledge its agent would have acquired but for the agent's negligence, if the agent was acting within the scope of his employment. *Cf. Campen v. Executive House Hotel, Inc.*, 105 Ill.App.3d 576, 61 Ill.Dec. 358, 434 N.E.2d 511 (1st Dist.1982) (in a discovery context, corporation charged with the knowledge agent would have learned if he had checked the corporate files), *but see Wycoff v. Motorola, Inc.*, 502 F.Supp. 77, 93 (N.D.Ill.1980) ("only actual knowledge of any attorney or agent can be imputable to the client or principal.")

The Bank makes the undisputed point that even if Giova had checked with the SIC before accepting each piece of collateral only one of the securities in question would have turned up as stolen. The security was the Port of Corpus Christi Series 1981–A Bonds received by the Bank on February 25, 1982, and reported as stolen to the SIC on February 23, 1982. Because this was the *first* security received by the Bank in the whole series of fraudulent loans a trier of fact perhaps could find or would have to find that a check on this should have put Giova on notice as to the stolen nature of the rest of the collateral. This finding would depend in part on the relationship between the two parties with whom Giova collaborated, both of whom used stolen collateral, and whether Giova would have had any reason to suspect Bruun's collateral once he found out the Cartage/Edward collateral was bad. That issue has not been developed.

There is a final line of argument regarding agency doctrine that neither party addressed and this court only mentions now in the hopes that the parties will develop the issues. General agency doctrine makes a principal liable for the fraudulent acts of its agent acting under apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568, 102 S.Ct. 1935, 1943, 72 L.Ed.2d 330 (1982), *citing Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *National Acceptance Co. of America v. Coal Producers Association, Inc.*, 604 F.2d 540, 542 (7th Cir.1979); *United States v. Fox Lake State Bank*, 240 F.Supp. 720 (N.D.Ill.1965). The main reason for this rule is that innocent third parties should not bear the loss caused by the agent; rather,

the principal itself which clothes the agent with the authority to conduct such

activities and by such actions places the agent in such a position that others will rely on that apparent authority, such principal must bear the loss occasioned by its failure to more discreetly dispense authority.

*U.S. v. Fox Lake State Bank,* 240 F.Supp. at 721.

The thread of agency doctrine which addresses a principal's liability for an agent's actions does not normally intersect the thread which addresses when and how knowledge is imputed to the principal. However, in one case the two were intertwined. The Supreme Court, in *Armstrong v. Ashley,* 204 U.S. 272, 27 S.Ct. 270, 51 L.Ed. 482 (1906), imputed knowledge gained by agents committing a fraud on the company to the principal, even though the principal argued the "adverse interest" rule. The Court said:

> The fact that those agents committed a fraud cannot alter the legal effect of their acts or of their knowledge with respect to the company in regard to third parties who had no connection whatever with them in relation to the perpetuation of the fraud, and no knowledge that any such fraud had been perpetuated.... In such a case the rule imputing knowledge to the company by reason of the knowledge of its agent remains.

204 U.S. at 283, 27 S.Ct. at 274.

If this law is still good it presents the legal question of how doctrines of agency fit with the policies behind and legal rules regarding bona fide purchaser status. For example, one of the main goals behind the structure of bona fide purchaser status is the easy negotiability of financial instruments. This goal trumps the desire to punish those who commit a fraud in obtaining and then disposing of such instruments. Thus, the purchaser takes the instrument free of any adverse claim on it. The risk of error or misconduct in this scheme may fall on innocent third parties. Should this allocation of risk change when a principal/agent relationship is involved? The court requests the parties to address this,

as well as develop the many factual issues that remain in dispute.

### Conclusion

Because key facts are in dispute the court denies defendants' summary judgment motion.