Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Lincoln J. BUMBA, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

James DIIORIO and Dorothy Diiorio, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Ralph W. EWRY, Jr., Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Anthony J. ALBERT, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Eugene ANDERSON, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Jerry BAUER, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Michael R. BENNETT, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Daniel R. LEE, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Thomas J. WASHBURN, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Carmen G. TUMINO, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Ralph RYDHOLM, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Harold K. RIDGWAY, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Vincent A. PERNS, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Fred K. HALL, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Charles M. CARTER, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Philip D. KNELL, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Charles LEMASTER, Defendant.

Newman JOHNSTON III and Phillip C. Asher, d/b/a Worldwide Collections, a general partnership, Plaintiffs,

v.

Harry M. KROGH, Defendant.

Nos. 88 C 10244, 88 C 10245, 88 C 10248, 88 C 10251 to 88 C 10254, 88 C 10277, 89 C 00115, 89 C 00117, 89 C 00118, 89 C 00120, 89 C 00121, 89 C 00169, 89 C 07660, 89 C 09129, 90 C 02723 and 90 C 02724.

United States District Court,
N.D. Illinois, E.D.

April 26, 1991.

James A. Stamos, Stamos & Rimland, Chicago, Ill., for plaintiffs.

Alan I. Becker, Burditt, Bowles & Radzius, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This matter is presently before us for decision following a bench trial on case No. 88 C 10244. The plaintiffs, Newman Johnston, III, and Phillip Asher brought this suit seeking to collect on a promissory note which they allege was executed and delivered by the defendant, Lincoln J. Bumba, in connection with Bumba's acquisition of an interest in a limited partnership known as Aqua–Solar Associates Limited ("Aqua–Solar"). This case is essentially identical to 17 other suits brought by the plaintiffs against individuals who executed promissory notes in the venture. We have consolidated these cases and each of the defendants has agreed to be bound in each of their own suits by the disposition of Bumba's case at trial. Having reviewed all of the testimony, exhibits, and stipulations of the parties, and for the reasons stated in these findings and conclusions, we enter judgment in favor of Bumba and each of the defendants.

## I. Background Findings of Fact

The following findings of fact are based on undisputed evidence and provide background for the further findings of fact and conclusions of law set forth in Section II. These facts set forth the basic chain of events and corporate history that give context to this dispute.

The Aqua–Solar limited partnership was formed in 1982 by A.T. Bliss & Company, Inc. ("Bliss"). Bliss, now known as Omni Equities, Inc., is a Massachusetts Corporation and served as general partner, managing the business of Aqua–Solar. The business plan for Aqua–Solar was to purchase solar water heating systems and lease those systems to homeowners in Florida. The purpose of the partnership was to make a profit from the leasing of the solar water systems. It was also intended that the investors in Aqua–Solar would receive tax benefits, including investment tax credits and solar energy credits based on Aqua–Solar's acquisition of the solar water heating systems.

During 1982, Bliss sold limited partnership interests in Aqua–Solar to Bumba and other investors. The Aqua–Solar offering began in March of 1982 and consisted of 185 units, at an investment of $150,000 per full unit and $75,000 per one-half unit. A full unit subscription required a cash payment of $37,500 and a promissory note for $112,500. A one-half unit subscription required a cash payment of $25,000 and a promissory note for $50,000. All of the promissory notes were made to the order of Aqua–Solar. The offering was completed on or about December 28, 1982. Ultimately, approximately 120 units were sold. Bumba purchased a full unit. The limited partnership interest purchased by Bumba was a security as that term is defined by

the securities laws of the United States of America.

In December 1982, Bliss, acting as general partner of Aqua–Solar, purchased 5,684 solar water heating systems from Bliss in its individual corporate capacity for a total price of $20,841,352. The purchase price for each unit was $3,660 per system. Aqua–Solar paid Bliss $5,241,352 in cash, and gave Bliss a promissory note ("Purchase Note") in the amount of $15,600,000 bearing interest at 9% per annum. Bliss retained a security interest in the solar water heating systems and the limited partners' promissory notes were pledged to Bliss as security for the credit portion of the purchase price of the solar water heating systems.

The leasing arrangement worked as follows. The business plan for Aqua–Solar provided that Nationwide–Florida ("Nationwide") would serve as servicing agent for Aqua–Solar. Nationwide was a subsidiary of a Delaware corporation, Nationwide Power Corporation. Under a property management agreement with Aqua–Solar, Nationwide's duties were to obtain lessees for the solar water heating systems, install the systems, provide subsequent service for the systems as needed, and collect lease payments from the homeowners. In each case, the homeowner lessee of the solar water heating system was to make an initial rental pre-payment of $478.80 which represented rental payments for two years. After pre-payment the homeowner was to have use of the solar water heating system for two years before any additional rental payments became due. At the end of the two years, the homeowner would have the option of retaining the solar water heating system under lease at a beginning rental of $22.50 per month or cancelling the lease and returning the solar water heating system to the partnership. In 1983, Nationwide succeeded in leasing all 5,684 of the solar water heating systems purchased by Aqua–Solar from Bliss. Nationwide accordingly received from Aqua–Solar the agreed upon fee of $568,400 and a percentage of the lease payments as compensation for its services. In 1983, Bliss also made further payments to Nationwide of approximately $650 per system for obtaining the lessees and installing Aqua–Solar systems. During this time period, Bliss owned between 41.4 and 44.5% of Nationwide's stock.

During 1983, Bliss also organized other limited partnerships, including Bliss Partners '83, Ltd., Solar–Bliss '83, Ltd., and Bliss–Solar '83, Ltd. Each of these limited partnerships had the same business plan as Aqua–Solar, the same general partner, the same servicing agent, and the same form of investment. None of the partnership interests was registered with the SEC.

In December 1984, at the request of Nationwide, Aqua–Solar terminated its service agreement with Nationwide. Nationwide sought to terminate the agreement to act as Aqua–Solar's servicing agent because it wished to pursue a program of selling solar water heating units and found it unprofitable to service Aqua–Solar's water heating systems. At about the same time, Bliss acquired sole ownership of Nationwide from its Delaware parent corporation. Contemporaneously with the termination of the Nationwide service agreement, Aqua–Solar appointed Magnacard, Inc., to become Aqua–Solar's servicing agent. Magnacard was then 80% owned by Bliss. Magnacard is now known as Highlander International Corporation ("Highlander").

During early 1985, the two-year pre-paid rental periods for those persons who had leased the solar water heating systems from the partnership began to expire. Many homeowners elected to cancel leases at the end of the pre-paid rental period and return the solar water heating systems to the partnership. Others, although not initially cancelling their leases, soon ceased to pay rent, thereby terminating the leases. By December 31, 1985, 1,869 systems that had ceased to be leased during 1985 were returned to Bliss. Bliss, in turn, gave Aqua–Solar a credit of $4,924,815 on the partnership's Purchase Note. During 1986, and additional 3,315 Aqua–Solar systems ceased to be leased, leaving approximately 500 on lease.

At some point in late 1985, Bliss organized a corporation named Aqua–Solar Management Corporation. Aqua–Solar management had no assets or employees. Its president was Reinhard Mueller, who was also president of Bliss. At that same time, Bliss (having changed its name to Omni Equities, Inc.) purported to resign as general partner and purported to substitute Aqua–Solar Management as the new general partner of Aqua–Solar. The Aqua–Solar Partnership Agreement provided that a resignation and substitution of general partner required the consent of the limited partners. The limited partners did not consent to the substitution of general partner.

On April 9, 1986, Bliss, assigned the Purchase Notes made by Aqua–Solar and the other Bliss partnerships, together with the notes made by Bumba and all the other limited partners to a wholly-owned subsidiary of Magnacard. The notes had a collective face value in excess of $10,000,000. In return for the assignment of the partner and Purchase Notes, Bliss received ten percent of Magnacard's stock, which increased Bliss' ownership of Magnacard from 80% to 90%.[1] In early May 1986, Bliss then sold its stock in Magnacard to another company for approximately $3,240,000. Thereafter, on May 15, 1986, Magnacard resigned as servicing agent for Aqua–Solar.

On June 12, 1986, Aqua–Solar Management (the "new" general partner) caused Aqua–Solar to sell to Magnacard all the remaining assets of Aqua–Solar, consisting of the solar heating systems still on lease, the outstanding leases, and the 3,315 solar heating systems returned by the lessees. Aqua–Solar received a credit of $1,000,000 against the Purchase Note that Bliss had assigned to Magnacard's subsidiary. Following the sale of the remaining assets of Aqua–Solar to Magnacard, Aqua–Solar Management notified the limited partners

that the sale had been made and that, as a result, the partnership was terminated.

In July 1986, Asher, who is a director, president and chief operating officer of Magnacard, wrote letters on behalf of Magnacard to Bumba and the other limited partners stating that their notes were in arrears and demanding payment. In August, Asher again wrote to Bumba and the other limited partners demanding payment on the notes. In September, Magnacard then filed lawsuits in Florida seeking to collect payment on the notes. Those suits were subsequently dismissed for lack of personal jurisdiction over the defendants.

On August 15, 1988, Magnacard's subsidiary, to which the notes had originally been assigned, assigned the notes to Asher and Johnston in exchange for $50,000 and their note in the amount of $9,500,000. Asher and Johnston subsequently initiated this lawsuit to collect the balance outstanding on Bumba's partner note.

## II. Findings of Fact and Conclusions of Law

There is no dispute that several of the elements for bringing a suit on a promissory note have been met. Thus, we find that 1) Bumba executed and delivered a promissory note, 2) the plaintiffs are the owners and holders of the promissory note executed by Bumba,[2] 3) Bumba has failed to make payment when due, and 4) the balance of the note is due and payable as a result of Bumba's default. Our detailed findings and conclusions therefore center on two considerations: first, whether Bumba possesses any defenses that would relieve him of his obligation on the note, and second, whether the plaintiffs have proved the balance of the amount due on the note.

### A. Defenses on the Note

■ By stipulation, Asher and Johnston have waived any claims of asserting

---

1. In his proposed findings of fact, Bumba asserts that "Aqua–Solar received an additional ten percent of the stock." We believe that the reference to Aqua Solar was an error, since the evidence upon which Bumba relies for this finding, and the logic of the transaction itself, indi-

cates that Bliss received the stock from the transaction.

2. Though there appears to have been a dispute as to this fact prior to trial, Bumba did not raise the issue during trial.

holder in due course status on the note.[3] Since they are not holders in due course, the plaintiffs are subject to all defenses Bumba could have raised against Bliss, the original holder of the note. Ill.Rev.Stat. ch. 26, § 3–306(b). Bumba has asserted defenses based on both federal and state law.

### 1. Securities Law Violations

We shall first consider the plaintiffs' right to recover on the notes on light of the stipulation that the partnership interests in Aqua–Solar were securities as that term is defined in the Securities Act of 1933. As a matter of public policy, the law forbids an action to enforce the collection of the purchase price of a security sold in violation of the federal securities laws. This principle applies both to violations of the Securities Act of 1933 ("1933 Act"), *General Life of Missouri Invest. Co. v. Shamburger,* 546 F.2d 774, 783–85 (8th Cir. 1976), and violations of the Securities and Exchange Act of 1934 ("1934 Act"), *Kaiser–Frazer Corp. v. Otis & Co.,* 195 F.2d 838, 843 (2d Cir.), *cert. denied,* 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952). Bumba contends that two violations of the securities laws occurred: the securities should have been registered, but were not, and the securities were sold through the use of false statements and omissions of material facts.

### (a). Registration and Exemption

It is undisputed that the securities sold in this case were not registered, and with respect to the offerings at issue, interstate transportation or communication in the mails was used in connection with the sale or offer of sale. These facts establish a prima facie violation of Section 5 of the 1933 Act, 15 U.S.C. § 77e, which requires registration of such securities. *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155–56 (5th Cir.1972). In order to overcome an ultimate finding of a violation and establish a threshold right to recover on the note, the plaintiffs have the burden of proving that the partnership interests were exempt from registration by law. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953). Accordingly, we must consider whether the plaintiffs have established the requisite exemption.

The parties agree that the only potentially applicable basis for exemption from registration under the 1933 Act is the exemption for sales "not involving a public offering," 15 U.S.C. § 77d(2), known in other words as the private offering exemption. In his post-trial brief, Bumba first points out that plaintiffs stipulated in the pre-trial order that the partnership interest sold to Bumba "was sold in a public offering." *See* Pre–Trial Order Statement of Uncontested Facts at ¶ 1. Thus, at the outset the matter would appear to have been decided. We have difficulty accepting that stipulation as dispositive of the issue, however, since the parties' actions at trial belied their words in the pre-trial order. At trial the parties proceeded as if the public offering question were at issue. Bumba never raised a relevance objection to evidence adduced by the plaintiffs to show that the transaction with Bumba was not part of a public offering, and indeed, Bumba dedicated a significant amount time at trial in adducing his own evidence to establish that the Aqua–Solar offering was in fact a public offering.[4] Thus, on the question of public offering, it is evident that the stipulation, even if it was intended to mean what

---

**3.** Notwithstanding the waiver, the evidence establishes that the plaintiffs were not holders in due course. Leaving aside the dispute concerning whether or not the note was in arrears at the time it was assigned to Magnacard, *see* Ill. Rev.Stat. ch. 26, § 3–302, we find that the relationship between the assignor Bliss and the assignees Magnacard—an 80 to 90% subsidiary of Bliss—and then the plaintiffs, Magnacard's officers, was sufficiently "intimate" to invalidate any claim the plaintiffs might have to holder in

due course status. *Christinson v. Venturi Constr. Co.,* 109 Ill.App.3d 34, 37, 64 Ill.Dec. 674, 676, 440 N.E.2d 226, 228 (5th Dist.1982).

**4.** In fact, throughout the course of the trial, the parties on both sides insisted on presenting evidence on what appeared to be undisputed questions of law and fact, thereby unduly complicating the task of crystallizing what is at issue and what is not at issue.

Bumba says it does, had been abandoned at trial. Accordingly, we shall consider and decide whether the Aqua–Solar offering was a public offering subject to registration under the securities laws.[5]

In making that determination, we first address Bumba's contention that the Aqua–Solar offering should be considered along with the offering of three other limited partnerships—Bliss Partners, Solar–Bliss, and Bliss–Solar—as constituting a single integrated offering. 17 C.F.R. § 230.502(a); *SEC v. Murphy*, 626 F.2d 633, 645–46 (9th Cir.1980) (series of sales of cable television limited partnership interests held to be single offering). The SEC has set out five factors commonly used in determining whether apparently separate offerings should be treated as one integrated offering:

> (a) whether the offerings are part of single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purposes.

Securities Act Release No. 4552 (Nov. 6, 1962), reprinted in Note at 17 C.F.R. § 230.502. *See also Murphy*, 626 F.2d at 645.

Factors (b) through (e) clearly have been met in this case. Each partnership was engaged in the same business in the same market. Each partnership had the same general partner and the same servicing agent. For each partnership, the method of offering and the form of investment were the same. The offering memoranda distributed by Bliss to offerees for each of the partnerships were substantially identical and the payment for each partnership interest involved a combination of cash and promissory note. With respect to timing, the interests in the four partnerships were sold during the twelve-month period December 1982 to December 1983, during which the offering of each partnership commenced within six months of the closing of the prior partnership.[6]

The plaintiffs nevertheless maintain, however, that Bumba has specifically failed to satisfy criterion (a)—that the sales be part of a single plan of financing. The plaintiffs rely solely on an allegation that there was no cross collateralization or use of funds of one partnership by a different partnership. The plaintiffs, however, have failed to indicate any place in the record that provides the evidentiary support for that allegation. Even assuming there is factual support for plaintiffs' position, we do not believe that the lack of cross collateralization weighs against a finding of integration in this case, given the overall structure of the partnerships as a common business venture. In essence, the venture did involve a single plan of financing, even if the funds ultimately obtained were allocated toward the serial purchase of distinct lots of solar water heating units. Accordingly, we conclude that the offerings should be considered a single integrated offering.[7]

We now turn to the public offering/private offering question. Following *Ralston*, courts have cited four factors as providing useful guidelines for determining

---

5. Bumba, most probably in recognition of the apparent abandonment of the stipulation, has fully addressed the merits of the public offering question in his post-trial papers. In addition, as we have pointed out, Bumba also extensively developed the issue at trial. Thus, there will be no prejudice in addressing the merits of the issue.

6. Because the offerings occurred within six months of each other, they cannot automatically be regarded as separate offerings under the securities regulations. *See* 17 C.F.R. § 230.502, and *former Rule 146*. 17 C.F.R. § 230.502 only treats as distinct:

> Offers and sales that are made more than six months before the start of a Regulation D offering or are made more than six month after the completion of a Regulation D offering, so long as during those six month periods there are no offers or sales of securities by or for the issuer that are of the same or similar class as those offered or sold under Regulation D. . . .

7. As will be seen below, our disposition of this case would nevertheless be the same even if the Aqua Solar offering is considered alone.

whether an offering of securities is public or private: 1) the number of the offerees and their relationship to the issuer; 2) the number of units offered; 3) the size of the offering; and 4) the manner of the offering. *See, e.g., Mary S. Krech Trust v. Lakes Apartments,* 642 F.2d 98, 101 (5th Cir.1981); *Continental Tobacco Co.,* 463 F.2d 137. Since the evolution of these guidelines, the Securities and Exchange Commission, under Congressional authority, has promulgated "safe harbor" rules in order to provide objective standards upon which businessmen may rely in raising capital under the private offering exemption found in 15 U.S.C. § 77d(2). Rule 146, issued by the Commission in 1974, was in effect at the time of the Aqua–Solar offering and therefore pertained to that transaction. 17 C.F.R. § 230.146. Soon after the Aqua–Solar offering, the Commission issued Regulation D, which replaced Rule 146 and thus governed the subsequent Bliss offerings. These standards appear to have refined, rather than abrogated, the judicial guidelines. Indeed, after the promulgation of the safe harbor rules, courts have considered and applied them in conjunction with the former precedential considerations. *See, e.g., Krech Trust,* 642 F.2d at 100–01; *Murphy,* 626 F.2d at 644–48.

We shall, however, primarily refer to the safe harbor rules, since they provide the more detailed framework for analyzing the availability of a private offering exemption. Where appropriate we shall look to the precedential considerations for further guidance. In addition, we observe that both Rule 146 and Regulation D set forth essentially similar criteria. Thus, we shall discuss our findings with reference to Rule 146. To the extent any difference between the two regulations materially impacts on our findings we shall so indicate.

The question of compliance requires an extended discussion of our findings only with respect to four of the Rule 146 criteria as to which there is a substantial factual dispute. Bumba contends that plaintiffs have failed to establish 1) that the partnership interests were not sold as part of a general solicitation, 17 C.F.R. § 230.146(c); 2) that none of the partnership interests was sold to any person who lacked the knowledge and the experience to evaluate the risk or was unable to bear the economic risk of the investment, 17 C.F.R. § 230.146(d); 3) that the sale of the partnership interests satisfied the "35 purchaser" limitation, 17 C.F.R. § 230.146(g); and 4) that the offerees and purchasers had access to the kind of information required under 17 C.F.R. § 230.146(e).

### 1) *Burden of proof*

■ The party claiming a private offering exemption from registration must show that it is met not only with respect to each purchaser, but also with respect to each offeree. *Murphy,* 626 F.2d at 645. Such proof must be "explicit, exact, and not built on conclusory statements" of the plaintiffs. *Continental Tobacco,* 463 F.2d at 156. We reject plaintiffs' contention that these evidentiary requirements do not apply with respect to proof of compliance with Section 146 or Regulation D. We see no reason why the evidentiary burden established by the cases we have cited should not also apply to proof of compliance with the later promulgated Sections 146 and Regulation D. Those regulations serve essentially as codified refinements to the private exemption considerations developed by caselaw following *Ralston.* The significance of the evidentiary burden imposed by these cases is not based on the particular bases for exemption under Section 4(2), but on how the seller must prove that the relevant standards were met. We do find, however, that the promulgation of Regulation D requires an adjustment in the evidentiary standard, since certain of the Regulation D standards pertain only to the ultimate purchaser, and not to any offerees. Accordingly, with respect to the three Bliss offerings subject to Regulation D, where relevant, the plaintiffs must show only that the criteria were met with respect to each purchaser.

■ We further observe that the bottom line issue when considering the availability of the private offering defense is whether the particular class of persons affected

needed the protection of the act. *Ralston,* 346 U.S. at 125, 73 S.Ct. at 984; *Krech Trust,* 642 F.2d 98. Thus, while the purpose of Rule 146 and Regulation D is "to provide objective standards upon which businessmen may rely in raising capital under the 4(2) exemption, 15 U.S.C. § 77d(2), ... failure to satisfy all of conditions of the Rule does not raise the presumption that the offering cannot be exempt." *Krech Trust,* 642 F.2d at 102. Ultimately, the question whether an offering is public or private is a question of fact which must be resolved in light of the particular circumstances. *Id.* at 101.

### 2) *General solicitation*

▆▆▆▆▆▆ Under Rule 146(c), an exemption is not available if a security is sold

by means of any form of general solicitation or general advertising, including but not limited to the following:

1. Any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio;

2. Any seminar or meeting.

The plaintiffs point out that the Bliss offerings were not sold through any published or broadcast form of advertising, nor through any seminar or meeting. However, that undisputed assertion does not conclusively satisfy the general solicitation prohibition. By its plain terms, the forms of solicitation mentioned in Rule 146(c) are nonexclusive examples of general solicitation. The rule leaves open for our consideration whether other unspecified means were employed by the issuer to obtain purchasers that would give rise to a finding of a general solicitation—means that would suggest that the offering was a public, as opposed to private, offering.

The precedential considerations cited above provide assistance in making that determination. On the question of the size of the offering and the number of units ultimately sold, we observe that the plaintiffs have failed to adduce evidence either to identify or to precisely number the total number of offerees, a failing which itself cuts against a finding in plaintiffs' favor on

this issue. *See Western Federal Corp. v. Erickson,* 739 F.2d 1439 (9th Cir.1984); *Murphy,* 626 F.2d at 637–38. We did learn, however, from the more generalized testimony of Reinhard Mueller (Bliss' former treasurer and later president), that Bliss sent out approximately 2500 confidential memoranda regarding the Bliss offerings. Of these, a majority purportedly were sent to registered broker dealers and various law firms, and at least one third were sent directly to individual investors. In all, there were approximately 275 investors in the four partnerships combined, with an investment amount totalling over $20,000,000. While *Ralston* made clear that there was no rigid limit to the number of offerees to whom an issuer could make a private offering, "the more offerees, the more likelihood that the offering is public." *Murphy,* 626 F.2d at 645 (finding that 400 purchasers in the aggregate and 7.5 million in securities sold clearly suggests a public offering rather than a private placement).

We next find significant the undisputed fact that many of the ultimate investors lacked any prior relationship with Bliss. In fact, of the one-third of the offerees who were directly contacted by Bliss, the plaintiffs failed to affirmatively establish that Bliss had a prior relationship with any one of them by specifically identifying those with whom it had prior dealings. In addition, although it may be proper for Bliss to have contacted the remaining two-thirds of its offerees through registered brokers and lawyers, that means of contact, depending on its scope and manner, nevertheless may be more indicative of a public, as opposed to private, offering. *Mark v. FSC Securities Corp.,* 870 F.2d 331 (6th Cir.1989). *Cf. Murphy,* 626 F.2d at 646 ("If an offering is small and is made directly to the offerees 'rather than through the facilities of public distribution such as investment bankers or the securities exchanges,' a court is more likely to find that it is private.") (citation omitted).

Here, the plaintiffs have failed to point to any evidence that a prior relationship existed between the brokers to whom Bliss sent memoranda and the offerees contacted

by the brokers. Further, while Mueller generally described the manner by which confidential memoranda were sent to brokers and lawyers, such conclusory testimony is insufficient to establish that Bliss exercised the kind of control over the release of information to brokers and made an appropriate prior evaluation and limitation of prospective offerees that would suggest private solicitation of offerees. In *Krech Trust*, for example—the only case cited by the parties that found an offering exempt from registration—the issuer compiled a select list of brokers, experienced in tax shelters and specializing in counseling a clientele of wealthy and knowledgeable investors. That select group was given information for their own use in determining which clients were suitable. Before a broker could ultimately receive the memorandum detailing the investment, the issuer questioned the broker with regard to his client's suitability. The process employed by the issuer served to carefully limit the ultimate number of offerees—fifteen in all. In addition to testimony detailing the plan, the offeree questionnaires, project fact sheets, list of brokers and other documents demonstrating the general control exercised by the issuer were offered into evidence. 642 F.2d at 102–103. In this case, by contrast, there evidently was no attempt to limit the number of brokers or law firms with whom Bliss would deal. Bliss also released offering memoranda to brokers and law firms, sometimes in batches of up to 50 at a time, without taking any prior steps to confirm who was receiving the memoranda. And although Mueller mentioned that Bliss later checked on the suitability of the interested offerees, the plaintiffs failed to substantiate this claim or otherwise establish control with any supporting documentary evidence or corroborative testimony. The plaintiffs proof on this point was neither explicit nor exact, and instead was built only on conclusory statements by the plaintiffs' witness Mueller. *Continental Tobacco*, 463 F.2d at 156.

Finally, evidence concerning certain direct offeree contacts by Bliss indicates that contact was made in a manner that further suggests a general solicitation. In particular, there was evidence that a Bliss salesman initiated "cold calls" to solicit at least two investors with whom Bliss had no prior dealings, Gerald Zatuchni and Daniel Ferry. We reject the plaintiffs' assertion that Ferry was only contacted in his capacity as a registered broker dealer. Ferry's unrebutted testimony revealed that a Bliss salesman originally called Ferry as an investor, and it was only after learning from Ferry that he was a registered broker dealer that the salesman sought to solicit Ferry's assistance in that capacity. Tr. at 339–40. Ferry's unrebutted deposition testimony also disclosed that Bliss salesmen were calling from nationwide lists of prospects. We give little weight to Mueller's testimony that he had a standing rule against such conduct since, even if we regard it as wholly credible, Mueller's control over such conduct was insufficient.[8] Whether or not Mueller wanted such activity to occur, it is evident that it did occur. The fact of its occurrence simply adds to our finding, based on the other factors, that the offering was conducted in the manner of a general solicitation.

### 3) *Capability of the investors*

Rule 146(d) requires that the issuer and any person who offers or sells securities on his behalf have "reasonable grounds to believe"

> 1) Immediately prior to making any offer, either:
>
> (i) the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or
>
> (ii) That the offeree is a person who is able to bear the economic risk of the investment, or

8. Mueller claims that there was a manual outlining his policy against such conduct by his salesman. Here too, however, the plaintiffs have failed to substantiate that testimony by offering the manual into evidence. Based on Mueller's testimony alone, we are not convinced that such a manual, if it in fact exists, addresses the matters that Mueller says it does.

2) Immediately prior to making any sale, after making reasonable inquiry, either:
(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or
(ii) That the offeree and his offeree representative(s) together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment and that the offeree is able to bear the economic risk of the investment.

Regulation D is concerned only with whether each purchaser of the security met these criteria.

Several aspects of our findings on the question of general solicitation have specific application to the question whether the plaintiffs have satisfied their burden of establishing the capability of the Aqua–Solar offerees and the purchasers of interests in the other partnerships. Here too, the plaintiffs rely on Meuller's conclusory testimony that the respective offerees and purchasers met the criteria. Yet, as to offerees or purchasers other than Bumba and the other defendants, the reasonableness of his conclusions was again uncorroborated by any records. Evidence merely showing that Bumba and the other defendants met the capability requirements does not carry the plaintiffs' burden with respect to the remaining offerees or purchasers. *See Continental Tobacco*, 463 F.2d at 161 (citing *Repass v. Rees*, 174 F.Supp. 898, 904 (no evidence as to the experience of buyers other than those before the court)).

4) *35 purchaser requirement*

■ Rule 146(g) requires that the issuer must "have reasonable grounds to believe, and after making reasonable inquiry, shall believe, that there are no more than 35 purchasers of the securities of the issuer from the issuer in any offering pursuant to the Rule." Rule 146(d) exempts from the calculation of the number of "purchasers," those purchasers who agree in

writing to purchase for cash in a single payment or installments, securities of the issuer in the aggregate amount of $150,000 or more. *See* Plaintiffs' Brief at 9.[9] In this case, that exemption would therefore apply to anyone who purchased a full unit of the Aqua–Solar offering. Regulation D exempts from the calculation, purchasers who are "accredited investors" as that term is defined in 17 C.F.R. § 230.501.

The only evidence that the plaintiffs offered on this issue was the testimony of Mueller. Mueller testified that he believed that only 29 investors subscribed for less than a full unit in the Aqua–Solar offering. Tr. at 75, 77. Mueller further testified that out of the three partnerships subject to Regulation D only five partners were not accredited investors. According to the plaintiffs, this testimony establishes that, whether or not the offerings are integrated, the total number of purchasers who are not otherwise exempt was 35 or less. On this point as well, however, we find Mueller's testimony too conclusory and unreliable to satisfy plaintiffs' burden of proving that there were no more than 35 unaccredited investors in the Bliss partnerships.

Mueller's assessment of the number of unaccredited investors was unsupported by corroborative documentary evidence. Plaintiffs burden was to show that the issuer had reasonable grounds to believe that no more than 35 investors were unaccredited within the meaning of Rule 146 and Regulation D. Although, Mueller generally described the process that he claims Bliss undertook to determine whether or not the purchasers were accredited investors, he did not refer to or offer into evidence the factual predicate upon which we could conclude that his assessment had a reasonable basis. While documentary evidence was presented as to certain investors (almost exclusively pertaining to the defendants), this evidence did not provide a complete picture as to the status of all of the investors such that a proper calculation could be made.

**9.** The plaintiffs have offered no other basis for determining exempt purchasers under Rule 146.

Absent such corroborative evidence, we are unable to ascribe persuasive weight to Mueller's conclusory testimony because it is otherwise problematical. First, with respect to the Aqua–Solar offering, Mueller's testimony taken as a whole is internally inconsistent. Prior to testifying that only 29 investors purchased less than a full unit in Aqua–Solar, Mueller stated that the total number of investors in Aqua–Solar alone was approximately 175. Tr. at 70. As we have earlier indicated, the partnership units were only sold in full or half units. According to the pretrial stipulation and plaintiffs' own proposed findings of fact the total number of Aqua–Solar partnership units subscribed was 120. That means that only 65 investors could have purchased full units and 110 investors had to have purchased half units to arrive at a total of 120 units subscribed [65 + (110 × ½) = 120]. Thus, the numerical evidence provided by Mueller establishes that far more than 35 "purchasers" obtained partnership interests in Aqua–Solar.[10] Given these facts, which were the only ones provided at trial, we are unable to place substantial reliance on Mueller's recollection that there were only 29 "purchasers" in Aqua–Solar.

Second, with respect to the offerings subject to Regulation D, cross examination of Mueller provided sufficient ground for us to discredit Mueller's testimony that there were only five unaccredited investors. Mueller was unable to identify the five unaccredited investors. Tr. at 161. In addition, Mueller was shown to have failed to disclose to the SEC the status of at least one investor whom Mueller on cross-examination admitted would have been unaccredited. Tr. at 161–65. Yet, Mueller could not account for the discrepancy, nor could he identify whether that investor was one of the five unaccredited investors to whom he was referring. Thus, it may well be that there were at least six unaccredited investors involved. Of course, we cannot conclusively determine that. Nevertheless, it

was not Bumba's burden to prove that there were more unaccredited investors; it was plaintiffs' burden to prove that there were not. Accordingly, we find that plaintiffs have failed to satisfy the 35 purchaser requirement.

## 5) *Provision of requisite information*

█ Rule 146(e) requires, among other things, that Bumba either individually or through his offeree representative had access during course of transaction and prior to the sale to the same kind of information specified in Schedule A of Securities Act of 1933, to the extent that Aqua–Solar or Bliss possessed this information or could acquire this information without unreasonable effort or expense. Regulation D imposes a substantially similar requirement. 17 C.F.R. § 230.502.

On its face, the Offering Memorandum that the defendants received appears to have provided the same kind of information required under Schedule A. Bumba's challenge as to whether Bliss complied with Rule 146(e), however, rests on his claim that the Offering Memorandum was false or misleading or omitted material facts. We find merit to the point since the information provided in Schedule A must not be false or misleading and must not omit material facts. *See* 15 U.S.C. § 77q(a)(2), (3). If the Offering Memorandum did not provide investors with the requisite material facts in a truthful and nonmisleading manner, then we would be hard pressed to conclude that the Offering Memorandum provided the *same kind* of information as required by Schedule A. Such a conclusion is compelled by the obvious public interest to which the access requirement responds: to ensure that purchasers do not enter into a securities transaction without having received proper information. Thus, we find it appropriate to consider Bumba's claims of misrepresentation and omission in deciding whether the plaintiff's have satisfied this criterion. For the reasons fully dis-

---

**10.** Even if we consider Bumba's proposed figure that 159 Aqua–Solar partnership units were ultimately sold, Def. Proposed Findings at ¶ 14, the number of half unit partners would have been thirty-two [143 + (32 × ½) = 159]. When one

combines the thirty-two unaccredited Aqua Solar investors with the admitted five unaccredited investors in the other partnerships, the total exceeds the permissible number of thirty-five.

cussed in subsection (b) below, we find that the Offering Memorandum did contain material misrepresentations and omissions of fact in contravention of what would have been required for a Schedule A filing.

In addition to the foregoing, although specific evidence was generated and went largely undisputed as to each of the defendants' access to information (albeit fatally flawed information), the evidence was lacking with respect to access of the remaining offerees and purchasers, who were clearly many in number—a matter that itself requires a finding against the plaintiffs as to this criterion. *Erickson,* 739 F.2d at 1443 (absent evidence of actual disclosure to each offeree, conclusory statement by promoter that all offerees had free access to information or that it was there for the asking will not defeat a motion for summary judgment); *Shamburger,* 546 F.2d at 782–83 (issuer did not establish how many offerees there were, or produce any evidence that all offerees had access to the relevant financial information which would be disclosed in a registration statement).[11]

### 6) *Remaining criteria*

As to Bumba and the other defendants, Bliss' compliance with the remaining Rule 146 and corresponding Regulation D provisions was essentially undisputed, and in any event was established at trial. Thus, we find

a) that the defendants had the opportunity to ask questions of, and receive answers from Bliss or each respective partnership or any person acting on their behalf, concerning the terms and conditions of the offering, and to obtain any additional infor-

mation, to the extent either Bliss or the partnership possessed such information or could acquire it without unreasonable expense, necessary to verify the accuracy of the information provided by Bliss and the partnership;[12]

b) that there was disclosure to each defendant in writing prior to sale concerning any material relationship between Bliss and each respective partnership and any offeree representative of the defendants, and any compensation received or to be received as a result of such a relationship;

c) that there was disclosure to each defendant in writing prior to sale that a purchaser of an interest in each partnership must bear the economic risk of the investment in the partnership for an indefinite period of time because the interests in the partnership had not been registered under the Securities Act of 1933 and therefore could not be sold unless they were subsequently registered or an exemption from such registration was made available;

d) that Bliss and each partnership exercised reasonable care to insure that the defendants were not underwriters within the meaning of Section 2(11) of the Securities Act of 1933 by taking such measure as outlined in Rule 146 and Regulation D; and

e) that at time of first sale of the securities in each partnership, the partnership and Bliss filed three copies of a report on Form 146 or five copies of Form D with the Securities and Exchange Commission.[13]

Even with respect to these criteria, however, perhaps with the exception of (e), we again find that there was insufficient evidence to indicate that the criteria were met

---

**11.** Even were we to infer from the testimony that each offeree received the same documents that the defendants received and signed the same waivers, the Note to Rule 146(e) states:

Access can only exist by reason of the offeree's position with respect the issuer. Position means an employment or family relationship or economic bargaining power that enables the offeree to obtain information from the *issuer in order to evaluate the merits and* risks of the prospective investment.

We do not believe the conclusory testimony adduced by the plaintiffs is sufficient to establish that each of the nondefendant offerees' po-

sition with respect to Bliss satisfied the requisites of the Note.

**12.** Here too, the satisfaction of this criteria would not excuse misrepresentations or the omission of any material facts.

**13.** We note, however, that the information contained in the form was not necessarily accurate, as evidenced by the Form D filing discussed above that stated there were no unaccredited investors in one of the partnerships, when at least one of the investors was in fact unaccredited.

as to nondefendant offerees and purchasers.

### 7) *Weight of factors*

 When we consider all of the foregoing in light of the bottom line consideration as to whether the class of individuals affected by the offering needed the protection of the Act, we are unable to conclude that the plaintiffs have met their burden and established by a preponderance of the evidence that the Bliss offerings were exempt from registration as a private offering. At root, we simply did not learn enough about the entire class of purchasers and offerees so as to conclude that they did not need the protections of the Act. In addition, where the plaintiffs' proof failed with respect to so many of the specific regulatory criteria, we are bound to find that the sale of the Bliss securities was impermissibly accomplished by means of an unregistered public offering. Accordingly, we conclude that the Bliss offerings were made in violation of the securities laws and that Bumba and the other defendants are entitled to prevail on this defense to the suit on the note.[14]

### (b). False Statements and Omissions of Material Fact

 Bumba's next defense to payment on the note is based on either of two alleged violations of the federal securities laws in connection with Bliss' statements about the offering.[15] First, the federal securities laws prohibit an offeror of securities from obtaining money by means of any untrue statement of a material fact or any omission to state a material fact, and also prohibit an offeror of securities from engaging in any business which would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a)(2) and (3). A violation of 15 U.S.C. § 77q(a)(2) and (3) does not require scienter. *Aaron v. SEC*, 446 U.S. 680, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Further, although there is no private right of action to recover damages for violations of 15 U.S.C. § 77q, *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942–43 (7th Cir.1989), we do not believe that *Schlifke* effects a change in the precedent that disallows an action to collect the purchase price for securities sold in violation of the statute. *Cf. Kaiser–Frazer Corp.*, 195 F.2d at 843–44 (refusing to enforce underwriting agreement in part due to misleading nature of prospectus).

Second, the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated by the SEC, 17 C.F.R. § 240.10b–5, prohibit the employment of any device, scheme or artifice to defraud, and prohibit the making of false statements of material fact and omissions of material fact in connection with the sale of a security. A violation of 15 U.S.C. § 78j and Rule 10b–5 requires scienter, which means an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The requirement of scienter is satisfied if material facts are omitted and the danger of misleading investors by the omission is obvious. *Schlifke*, 866 F.2d 935, 942–43 ("10b–5 ... proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate

---

**14.** The plaintiffs have not contested that the finding of a securities violation by Bliss, based on the failure to register a nonexempt offering, would give Bumba an appropriate defense to suit on the note. In any event, we further observe that the fact that Bumba may have been a capable investor and may have had access to the kind of information contained in a registration statement is of no consequence to the availability of the defense to any purchaser subject to a suit on a note brought by a securities law violator. The defense has not been limited only to those who ultimately did not have access to the information required in a registration statement, but has been provided even to a purchas-

er who was shown to be a capable investor who had prior dealings with the issuer, and who himself knew of the nonregistration and had an opportunity to make fairly extensive inquiry as to the offering before purchase. *See Shamburger*, 546 F.2d at 776 n. 1, 778, 784. *Cf. Kaiser–Frazer Corp.*, 195 F.2d at 838 (purchaser prevailing on defense had full knowledge of all the facts prior to time it entered into underwriting agreement).

**15.** Although the parties do not mention who bears the burden of proof on this defense, we presume that the burden now lies with Bumba.

a duty to disclose whatever additional information is necessary to rectify the misleading statements."); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224 & 225, 54 L.Ed.2d 155 (1977).

 Bumba claims that Bliss made two affirmative misrepresentations of material fact and two omissions of material fact that amounted to violations of both the 1933 and 1934 Acts. First, Bumba maintains that Bliss misleadingly represented its net worth as general partner. The Offering Memorandum represented that Bliss, the general partner, was highly successful in the solar energy business; that Bliss had earned profits in excess of $7,900,000 during the years 1979–81; and that Bliss had a net worth in excess of $8,000,000. In particular, employing the "accrual method" of accounting, Bliss' reported earnings in the years preceding the offering was $735,284 in 1979, $2,304,627 in 1980, and $4,878,353 in 1981. In 1984, as a result of dealings with the SEC, Bliss eventually restated its financial statements for the years 1979–81, this time utilizing the cost recovery method of accounting. Bliss' reported earnings for the period were substantially reduced: ($20,352) in 1979, $77,058 in 1980, and $396,936 in 1981. In addition, as of December 1981, Bliss' restated net worth was $546,332, rather than the originally reported $8,010,955. Mueller's testimony revealed further substantial differences in figures depending upon which of the two methods was applied. For example, reported gross profits of $9,700,000 in 1981, amounted to zero as later restated. Tr. at 215–217.

There can be no doubt that the initial net impression of any ordinary investor as to Bliss' financial status would be significantly different depending on which method of accounting was employed. The question whether the reported figures in the Offering Memorandum amounted to a misrepresentation, however, ultimately turns on whether it was improper and misleading for Bliss to use the accrual method of accounting in stating its financial position.[16] The plaintiffs rely exclusively on Mueller's opinion that the accrual method of accounting was a more appropriate method of reporting Bliss' financial position than the cost recovery method of accounting.[17] Tr. at 211. Mueller's explanation for why he used the accrual method was that it was the most frequently used method for corporations, though he did not indicate whether the method was typically used in investment offering materials. Mueller further implied that the accrual method most accurately reflected the underlying transactions and most closely matched Bliss' income with its expenses, but did not explain his reasons for that belief. *See* Tr. at 208. To rebut this testimony, Bumba established only that the original figures and the restated figures were so disparate as to amount to a material difference—e.g. a fact which a reasonable investor would consider important in determining whether or not to invest, *see* Tr. at 358–59. Bumba failed to adduce evidence to effectively counter Mueller's assertion that the accrual method was an appropriate choice, or to show that Bumba was actually mislead by the figures. At best, use of the accrual method may not have been the preferred choice of the SEC (as indicated by the outcome of the consent decree), but as we have already noted, the consent decree establishes nothing. Ab-

**16.** On this question we accord no weight either to the complaint filed by the SEC or to the consent decree under which Bliss agreed restate its financial statements.

**17.** In their reply, the plaintiffs irresponsibly refer us to Mueller's testimony regarding what he claims was the opinion of Bliss' accountants, Laventhol & Horvath, on the issue. We struck that testimony as clearly inadmissible hearsay. *See* Tr. at 211–14. In addition, we note that at trial we reserved ruling as to Bumba's objection to the opinion testimony of Mueller based on a lack of foundation for the opinion. We admit the testimony, since it is at least relevant on the question of Mueller's state of mind in deciding to account for Bumba's net worth in the manner he chose. Further, to the extent the plaintiffs seek to rely on Mueller's background as a CPA and chief financial officer as foundation for the giving of the opinion, we allow the testimony on that basis as well, for what it is worth. The issue as to this testimony is one of weight rather than foundation.

sent evidence or testimony that Bliss' use of the accrual method of accounting was clearly improper under the circumstances, we cannot conclude that the financial statements were false or materially misleading.[18]

■ Bumba's next claim of misrepresentation relates to the fair market value of the solar equipment sold by Bliss to the partnership. Bliss represented in the Offering Memorandum that the sales price of $3,660 per system to be purchased from Bliss did not exceed the fair market value of the equipment. Offering Memorandum at 63. This representation was material because the projections as to tax benefits and cash flow were premised on it. If the cost of the systems was substantially less than fair market value, the tax benefits would be significantly reduced because the basis for the tax credit is cost or fair market value, whichever is lower. The representation is also significant as it relates to how much profit Bliss would earn from the sale. With respect to both of these issues we find the Offering Memorandum materially misleading.

The evidence at trial established that the actual cost of the solar water heating equipment to Bliss was most likely $880 per system, and perhaps even lower. *See, e.g.,* Tr. at 456. It is undisputed that Bliss added no value to the equipment in selling it to the partnership. Bliss therefore apparently stood to make a profit well in excess of $2,000 per system. These facts indicate not only that the cost of the systems in the hands of the partnership was lower than the fair market value, but also that the fair market value as stated was misrepresented. The only evidence of fair value presented by the plaintiffs was the "Solar Shopping Guide," which showed that the market price of similar systems to individual retail consumers was comparable to the stated per system price for the Bliss System. This evidence does little to establish the fair market value of the system in the hands of Aqua–Solar, however, since the partnership was functionally a distributor of the systems, not a retail consumer. On the question of the fair market value to a purchaser in Aqua–Solar's position, buying in bulk from a wholesaler, Jeffrey Tiller, Bumba's cost expert, ultimately concluded that the amount charged to the partnership was excessive. Although the plaintiffs point out that Tiller based his calculation as to cost on 1983 rather than 1982 figures, we find Tiller's opinion reasonably supported and indeed corroborated by Bliss' own Form 10K report. If anything, Tiller's testimony and the 10K reveal that Tiller's calculations were conservative. Since the equipment was readily available at wholesale cost below $1,000 per system, the Offering Memorandum representation of fair market value was grossly overstated. Alternatively, if it was Bliss' intent to charge retail prices to the partnership, without any discount for volume, that fact alone should have been more plainly disclosed.

■ The plaintiffs argue, however, that Bliss incurred additional costs in providing the systems to the partnership which offset the degree of difference between the wholesale cost of the equipment and the stated purchase price. According to Mueller, the total cost was $2,380. We have several problems with this testimony. First, Mueller's figure does not significantly alter the tax concern, because it is still much lower than the claimed fair market value. In addition, Mueller's total partly includes the cost of paying an additional $650 to Nationwide for marketing and installing the systems. Tr. at 196–200. According to the unrebutted testimony of Professor Haft and Jay Zabel, this charge could not be included for the purposes of the energy tax credits. Tr. at 366, 391. Further, Mueller based his figure on his recollection that the cost of the basic solar equipment to Bliss was $1,000. As we

---

**18.** We note, as did the plaintiffs in a footnote, that the Notes to Financial Statements, found in the Offering Memorandum at page 25, disclosed that the Bliss' financial statements "were presented on the accrual basis." Though partially germane to the issue at hand, if the use of the accrual method had been improper, Bliss' action nevertheless would not have been excused by disclosure.

have found, however, the evidence shows that the base price was at least $120 lower. Finally, Mueller's figure includes $480 representing the cost of each solar water tank. The Offering Memorandum, however, specifically provided in boldface that a solar water tank was "Not included in system to be purchased by Partnership. Tank to be supplied by leasing agent." Offering Memorandum at 11; *see also id.* at 34. Since the limited partners did not expect to purchase water tanks, the cost of water tanks was not a factor that the investors would have taken into account in assessing the tax benefits of the offering.[19]

■■■■■ Mueller's attempt to pad the bill so as to decrease the potential profit brings us to the question whether Bliss should have disclosed how much it stood to gain by the transaction. As we have observed, without all of Mueller's add-ons, Bliss' profits per system would have exceeded $2,000, which we find is a material fact warranting disclosure. If we accept Mueller's $2,380 as the proper figure for the total cost of providing the system (discounted by the $120 miscalculation of the base price), the limited partners nevertheless were entitled to know that Bliss stood to make a direct profit of up to $1,420, that Bliss would further profit from the additional payments to Nationwide by virtue of Bliss' shareholder interest in that company (see below), and that Bliss would be drawing an additional $250 purportedly to cover Bliss' overhead.[20] The plaintiffs ask us in

a footnote to remember that the Offering Memorandum disclosed that Bliss would make a "substantial profit" on the sale of the equipment to the partnership. Plaintiffs' Reply at 12 n. 11.[21] We find this disclosure too vague to satisfy the requirements of disclosure, particularly where the fair market value of the systems was misrepresented.[22]

■■■■■ On a related issue, Bumba raises the Offering Memorandum's failure to disclose that Bliss would be making additional payments to Nationwide (40% owned by Bliss at the time), for services already covered by agreement and otherwise disclosed in the Offering Memorandum. The Offering Memorandum stated that Nationwide would charge a flat fee of $100 per system plus a percentage of rental "for all services rendered in accordance with the Agreement." Yet, Bliss arranged to pay Nationwide an additional $650 per system to perform the same service of leasing and installing the systems. We reject the plaintiffs' contention that Bliss, and not the partnership, incurred this expense of paying Nationwide the additional $650 per system to lease and install the systems. That assertion is inconsistent with the plaintiffs' previous argument that this payment was part of the cost of the equipment, in which case it was passed on to the partnership.[23] In addition, since each system would only generate a lease payment of $240 per year, the fact that it would cost $750 and not $100 to lease and install the systems was a

---

**19.** The plaintiffs refer to the stipulation that Bumba's tax benefits have not been disallowed by the IRS. *Id.* at 9 n. 9. Presumably, Bliss relies on this as affirmative evidence that the equipment was fairly valued. The action or inaction of the IRS, however, is irrelevant as to the factual question of the true cost of the equipment and the legal issue whether Bliss' statement of the fair value of the systems was false or misleading.

**20.** On the question of overhead, the plaintiffs neither disclosed in the Offering Memorandum nor specified why Bliss' overhead for selling 5,680 systems to Aqua–Solar amounted to $1,410,000 (5,680 × $250).

**21.** This matter of fact, which substantively pertains to issue at hand, should have been raised by the plaintiffs in their proposed findings of fact, or at least in the body of one of their

briefs. Ordinarily, the established practice of the Seventh Circuit and this district holds that substantive matters raised in footnotes are to be disregarded. However, since we were aware of this disclosure from our own review of the evidence, we include it in our discussion for the sake of completeness.

**22.** If there was no misrepresentation as to the fair market value, then Bliss might not have had to further disclose precisely how much it would make on the deal, since it could be presumed that Bliss' profits would be no greater than any other wholesaler.

**23.** Indeed, the same may be said for the purchase of solar water heater which was supposed to have been undertaken by Nationwide.

material aspect of the business venture that should have been disclosed.

Finally, Bumba claims that in addition to mentioning general tax risks, the Offering Memorandum should have disclosed the fact that, in considering whether to allow certain solar energy and investment tax credits, the IRS was questioning the fair market value of solar water heating systems sold by Bliss to investors during 1979–81. We reject this claim because the evidence failed to show that Bliss had knowledge of any challenges to tax deductions of other Bliss syndications until after the Aqua–Solar partnership closed.

■ Viewing the limited amount of incorrect or vague information that Bliss did disclose, in conjunction with what Bliss omitted as to the cost of the systems and its dealings with Nationwide, we find that the Offering Memorandum was materially misleading. We also find that Bumba established that, had the appropriate information been disclosed as to these matters, Bumba's representative Zabel would not have recommended the investment and Bumba would not have invested. In this regard, we find persuasive Professor Haft's opinion concerning the importance of a full disclosure by the general partner. Tr. 370–74. Such disclosure is particularly warranted when it relate to matters as to which there is an evident conflict—in this case, where a general partner is purchasing goods from itself on behalf of the partnership and where a general partner has a substantial pecuniary interest in a company that is contracting with the partnership.

■ Accordingly, we conclude that Bumba has established a violation of 15 U.S.C. § 77q(a)(2), (3) as well as a violation of 15 U.S.C. § 78j and Rule 10b–5. As to the latter, we find sufficient evidence of scienter in Bliss' decision not to disclose the details of the profits picture and its dealings with Nationwide. In allowing Bumba to prevail on this defense, we reject the plaintiffs contention that Bumba must not only show "transaction causation"—which we have found to exist—but also "loss causation." *See generally Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–85, (7th Cir.1990) *cert. denied*, —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). Loss causation is an element of a claim for damages and was created by the federal courts as an analog to the common law fraud rule. *Id.* The defendants in this case do not seek damages and the plaintiffs have offered no reason why the loss causation requirement should be extended to parties asserting a securities law violation as a defense to payment on a note. The underlying rationale for refusing to allow a claim for damages unless loss causation has been shown, is to prevent a windfall to the investor who would have lost her investment regardless of the fraud. *See id.* at 685. Refusing to enforce payment on the outstanding purchase price of a security obtained in violation of the securities laws serves a different policy objective and, in effect, counterbalances the correlative windfall that would otherwise inure to the issuer.[24]

---

**24.** Bumba posits a useful analogy to a contract involving illegal gambling where, absent an authorizing statute, the courts will not enforce the affirmative claims of either party, but leave the parties where they are. *See Brelsford v. Stoll*, 304 Ill.App. 222, 227, 26 N.E.2d 159 (3d Dist. 1940).

Although we make no finding as to whether or not loss causation was in fact established, we observe in passing that our review of the evidence disclosed a matter that would bear on the loss causation question. The Offering Memorandum represented "[s]ince the equipment is expected to be leased to individual homeowners, competition will not come from other solar equipment, but from other sources of energy to heat domestic water...." Offering Memorandum at 35. Yet, the parties stipulated that one reason for the return of leases was competition from other solar companies that were selling solar water systems. Asher further clarified at trial that in December 1985, Bliss had encountered some competition from companies selling systems to Aqua–Solar's lessees, who decided they wanted to buy a system rather than lease it. Given the pricing and structure of the business dealings between Bliss and both Nationwide and the partnership, Bliss' approach may have greatly affected the ability to compete, a matter suggested, but not fully developed at trial. It is interesting to note that, just prior to the expiration of the two-year lease period, Bliss allowed Nationwide to terminate the service agreement so that Nationwide could pursue a program of selling solar water heating units. This occurred at a time when Bliss acquired sole ownership of Nationwide.

### 2. Common Law Defenses

Because we have found that Bumba is relieved of any further obligation on the note held by the plaintiffs due to Bliss' violations of the federal securities laws, we need not go further and decide whether Bumba should prevail on his remaining common law defenses. For the record, we shall briefly set forth those defenses upon which Bumba relied post-trial:[25] Bumba asserted that the note became unenforceable because 1) Bliss breached its fiduciary duties as general partner to Bumba; 2) Bliss and Aqua–Solar impaired the primary collateral when it sold the Aqua–Solar water heating systems to MagnaCard in June 1986, without notice of the sale to Bumba and without establishing the commercial reasonableness of the sale; and 3) Bumba was entitled to raise his rights under a Put Agreement as an offset, in the nature of recoupment, against claims made under his note by Bliss' assigns.

### B. Balance Due on Note

 In the alternative to finding in favor of Bumba on the securities law defense, we find that the plaintiffs have failed to prove the amount due on Bumba's note. It was the plaintiffs burden to establish the amount due. Based on Asher's testimony, the plaintiffs claim an outstanding balance of $109,682.64 as of August 1, 1990. Asher reached that figure by calculating the yearly accrual of interest on the note less certain credits,[26] in this case, a stipulated partnership distribution in December 1983 of $17,530, a December 1984 payment by Bumba in the amount of $8,000, a December 1985 pro rata credit of $35,515 based on returned systems, and a June 1986 pro rata credit of $7,200 as a result of MagnaCard's purchase of Aqua–Solar's remaining equipment. Tr. at 284–

86. On cross examination, however, Bumba cast doubt as to completeness of Asher's calculations. Asher admitted that he did not calculate for lease revenues in 1985 that might have come to Aqua–Solar in 1985, but which were not distributed to the partners. Nor did he calculate for any lease revenues in 1985 that might have been retained by the general partner and note holder, Bliss for which the partners would have been entitled to receive a credit. Tr. at 311–13. Asher's calculation also does not reflect any credit for lease revenues received by Bliss in 1986 before the leases were sold to MagnaCard. The plaintiffs did not rehabilitate Asher on this point, nor did they offer evidence to adjust for the considerations raised by Bumba. Asher's own testimony reveals that not all of the leases were returned by 1985, or even 1986. *See also, supra* at 8. The lease revenues must have gone somewhere, and it is undisputed that they were not distributed to the partners. The failure to account for these lease revenues, even by showing that there was no surplus for distribution or credit, renders the plaintiffs' calculation as to damages fatally incomplete.

### III. Conclusion

Judgment is entered in favor of Bumba in Case No. 88 C 10244. In each of the consolidated cases judgment is also entered in favor of the respective defendants.[27] It is so ordered.

---

**25.** Any defenses that might have been raised earlier shall be deemed waived.

**26.** Asher's calculations apparently have the effect of adding interest to principal annually, then calculating the following year's interest on the combined principal and interest—compounding the interest. Bumba's note refer's to interest at the rate of "9 percent per annum," but makes no reference to compounding the interest. Bumba accordingly raises the plain-

tiffs' failure to establish either in fact or by law that compounding the interest was proper. Bumba raised this matter, however, only in his post-trial papers, and in a footnote at that. That afforded the plaintiffs an insufficient opportunity to respond. Thus, we shall disregard this issue as not properly raised.

**27.** *Johnston v. Diiorio*, Case No. 88 C 10245; *Johnston v. Ewry*, Case No. 88 C 10248; *Johnston v. Albert*, Case No. 88 C 10251; *Johnston v.*

*Anderson,* Case No. 88 C 10252; *Johnston v. Bauer,* Case No. 88 C 10253; *Johnston v. Bennett,* Case No. 88 C 10254; *Johnston v. Lee,* Case No. 89 C 00077; *Johnston v. Washburn,* Case No. 89 C 00115; *Johnston v. Tumino,* Case No. 89 C 00117; *Johnston v. Rydholm,* Case No. 89 C 001181; *Johnston v. Ridgway,* Case No. 89 C 00120; *Johnston v. Perns,* Case No. 89 C 00121; *Johnston v. Hall,* Case No. 89 C 00169; *Johnston v. Carter,* Case No. 89 C 07660; *Johnston v. Knell,* Case No. 89 C 09129; *Johnston v. Lemaster,* Case No. 90 C 02723; *Johnston v. Krogh,* Case No. 90 C 02724.